## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 1:21CR00407** |
| | ) | |
| **DARYL JOHNSON** | ) | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

The defendant, by and through counsel, respectfully submits this

memorandum in aid of sentencing. He respectfully requests that he be sentenced to

the low end of his guidelines for the reasons outlined below.

### PROCEDURAL BACKGROUND

1. Mr. Johnson entered a guilty plea to Civil Disorder, in violation of 18

USC §231(a)(3), based on his entry into the Capitol building on January 6, 2021.

Pursuant to his Plea Agreement and the Sentencing Guidelines, his Offense Level

is 8 (Zone A) and he has 0 criminal history points, placing him in Criminal History

Category I. The parties agree the resulting guidelines range is 0 to 6 months

incarceration and a fine of $2,000 to $20,000. Because he is in Zone A, a sentence

of imprisonment is not required. *See,* USSG § 5C1.1(b). And Congress has

specified the "general appropriateness of imposing a sentence other than

imprisonment in cases in which the defendant is a first offender who has not been

convicted of a crime of violence or an otherwise serious offense."  28 U.S.C. §

994(j). For the reasons discussed below, the defense submits that the appropriate

sentence in this case is probation and a reasonable fine.

## NO MATERIAL ERRORS IN PSR

2. There are no material errors in the Presentence Report (PSR).

3. The PSR, as well as the parties per the executed plea agreement, have all

calculated Mr. Johnson's sentencing guideline range to be 0 - 6 months. *See*, PSR

at ¶ 126 and Dkt. # 37 at ¶ C. The fine range, based on Mr. Johnson's net worth,

has been calculated to be $2000 to $20,000. See, PSR at ¶ 128.

## GUIDELINES ARE NOT MADATORY

4. As it knows, the Court has broad discretion to consider every aspect of a

particular case, and a particular defendant, in fashioning an appropriate sentence.

*United States v. Booker*, 543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38

(2007); *Kimbrough v. United States*, 552 U.S. 85 (2007). Although the Court must

first calculate the appropriate sentencing range under the Guidelines, it is not

bound by the Guidelines or Guidelines Policy Statements. It may make its own

policy judgments, even if different from those in the Guidelines. *Kimbrough*, 552

U.S. at 101. The Court must impose a sentence consistent with the terms of 18

U.S.C. § 3553(a) and § 3661.

## SENTENCING FACTORS

5. The core requirement of 18 U.S.C. §3553(a) is that the court impose *"a sentence sufficient, but not greater than necessary"* to comply with the purposes of sentencing set forth in § 3553(a), which provides no order of priority among the factors. The factors outlined in § 3553(a) are as follows:

• The nature and circumstances of the of the offense and the history and characteristics of the defendant 18 U.S.C. § 3553(a)(1);

 • the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A);

• the need for the sentence imposed "to afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B);

• the need for the sentence imposed "to protect the public from further crimes of the defendant," 18 U.S.C. § 3553(a)(2) (C);

• the need for the sentence imposed "to *provide the defendant with needed* educational or vocational training, *medical care*, or other correctional treatment in the most effective manner," 18 U.S.C. § 3552(a)(2)(D);

• the kinds of available sentences available, 18 U.S.C. § 3553(a)(3);

• the guidelines in effect at the date of sentencing and any pertinent policy statements, 18 U.S.C. § 3553(a)(4) and (5);

• "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6);

• "the need to provide restitution to any victims of the offenses," 18 U.S.C. § 3553(a)(7).

## SENENCE AT LOW END OF GUIDELINE RANGE WARRANTED

**The Offense**

6. Mr. Johnson is a passionate man and is politically conservative, but he has not been a political activist. He owns and operates several laundry facilities in multiple cities.  During the riots in the summer of 2021, two of his establishments were severely vandalized and damaged. No one was prosecuted, no one offered him any recourse, much less assistance. He came to Washington to have his voice heard.  He came to protest being ignored. And the former president had the appearance of being responsive to his complaints. To his regret, he became caught up in the moment.

7. He is not proud of having entered the capital. Mr. Johnson did not come to D.C. on January 6, 2021, to break the law or engage in civil disobedience. He came to exercise his First Amendment rights through a rally and to protest being ignored.

4

He wanted the leadership in this country to take note of the people that felt ignored by their government. He had no plan to enter the Capitol building and, during the events at issue, he did not break anything, take anything, or hurt any person – because that was never his intent.

8. What he ended up doing was unlawfully entering the Capitol building at approximately 2:20 p.m. by climbing through a broken window next to the Senate Wing Door on the West side of the Capitol, and then remaining in the building for approximately 26 minutes. He ascended to the Rotunda where, according to the Government, he was among a group of persons who "rushed" a line of law enforcement officers standing in front of the East Rotunda doors and helped push through the officers and push open the East Rotunda doors, allowing persons outside the building to enter. However, Mr. Johnson never touched anyone, he simply moved with the crowd.

9. The Court will determine from the video evidence the actual nature of his behavior. As the Court noted at the time Mr. Johnson entered his guilty plea, "It's hard to get a real feel for what happened on that day without seeing the footage."

10. Notably, there is no allegation that either Mr. Johnson engaged in any altercation with a law enforcement officer or anyone else.  In sum, he unlawfully entered the Capitol that day and aided others in unlawfully entering the Capitol. That is the substance of his criminal conduct. The probation officer concludes that

his "actions were that of an average participant."  See PSR at ¶ 36. He was a

follower, not leader. And he deeply regrets coming to Washington on January 6,

2021.  *See*, Ex. 1.

**Mr. Johnson's post-January 6 statements**

11. The Government has emphasized a few isolated social media comments

made by Mr. Johnson after the events of January 6, 2021. The Government cites

three posts:

- On January 7, 2021, he said: "Mark my words Yesterday will be the beginning of the revolution …  what happens when those same people [the Jan. 6 demonstrators] decide to throw out the 'elected official' It will be hangings on the front lawn of the capitol—that crowd is not messing around—I now understand what our founding gathers gave up their fortunes for freedom—Thai generation will follow suit (sic).
- On January 13, 2021, he said: "It was a large group that was in the capital But the left is going to do all they can to paint all conservatives as evil Put on your big girl panties! It's going to get very ugly and probably result in some version of a civil war (sic)."
- On February 7, 2021, he said: "Bring it on Biden!" I have no problem dying in a pool of empty shell casings."

12. There are two reasons why these posts should not affect the sentence that

Mr. Johnson receives. The first is legal. A person cannot, consistent with the First

Amendment, be punished for expressing his views on a political issue.  *See Cohen

v. California*, 403 U.S. 15, 18 (1971); *Hess v. Indiana*, 414 U.S. 105, 107-08

(1973).  In this nation we punish people for their actions, not for their political

opinions. And Mr. Johnson's actual criminal conduct on January 6 was equivalent to that of the average participant that day.

13. Second, as a factual matter, these posts do not demonstrate any criminal intent or tendencies on Mr. Johnson's part. They are passionate because he is a passionate man and social media invites passionate statements of opinions.  The sentiments Mr. Johnson expressed are standard fare on the internet. But there is no evidence that he was seeking to foment violence or promote the forceful overthrow of the government, either on January 6 or thereafter. To the contrary, Mr. Johnson's actions during his 51 years of life, and on January 6, brand him as a peaceful man.

14. On January 13, he warns that "the left is going to do all they can to paint all conservatives as evil" and "It's going to get very ugly and probably result in some version of a civil war."  This is a cautionary admonition; he is not seeking to spur on this result. And his comment on February 13 – "Bring it on Biden!" I have no problem dying in a pool of empty shell casings" – is merely "stand your ground" bravado.  Significantly, Mr. Johnson did not bring any weapon with him to D.C. on January 6, nor has he ever exhibited any violent tendencies.

**Mr. Johnson's Personal Background**

15. Mr. Johnson is 51 years old.  He has been married to his wife, Lisa, for 30 years. They have two children: a son, Daniel, who is 29 years old and lives with

them, and a daughter, Jennifer, who is 24 years old and lives four blocks away.

Daniel is a roofer with over 10 years' experience, while Jennifer is an assistant

shipping manager for a printing company. The family resides in Saint Ansgar,

Iowa, a small town with a population of 1,160 as of the 2020 census. Mr. Johnson's

parents also reside in Saint Ansgar.

16. Mr. Johnson grew up in a close-knit, religious home. There was no drug

or alcohol use within the home, and he graduated from a Baptist high school. Mr.

Johnson described his family's socioeconomic status as lower income when he was

young—he often left the table hungry. His father struggled financially, eventually

going to work for an insurance company. He started as an insurance adjuster and

overtime rose to be the chief executive of an insurance company. Mr. Johnson

describes his family as "hard working"—to work 70 hours per week was normal

for them.

17. Mr. Johnson was the middle of three sons in his family. When he was 16

years old, in 1987, his older brother, Greg, was killed by electrocution in a

construction accident. This event was devastating to Mr. Johnson and his family,

although he believes their grief drew them closer together.

18. Mr. Johnson suffers from Crohn's disease, which was first diagnosed in

1995. It caused a perforated bowel that required surgery -- his bowel was re-

sectioned, and some intestines were removed. He takes medications which include

Prilosec and Entyvio, a Crohn's-related anti-inflammatory medication that he receives by injection every eight weeks.

**Mr. Johnson's Business and Professional Activities**

19. Mr. Johnson is a successful small business owner. He operates nine laundromats, a tanning salon, and a manual car wash through five corporations. Most of these businesses are in Minnesota, with the majority being in Minneapolis/St. Paul. Ownership of the corporations is divided between Mr. Johnson, his wife, and his parents. One corporation is co-owned by a third party.

20. Mr. Johnson has been very active in the laundromat industry and is well known and highly regarded by his peers. For the last ten years he has served on the Board of the national Coin Laundry Association (CLA). He also serves on the Board of its charitable Laundry Cares Foundation (LCF).

21. Brian Grell, a past chairman of the CLA and the current head of the LCF, relates that "[d]uring my tenure as Chairman[,] Daryl became my go to board member always making himself available for any task or cause." Another CLA Board member, Paul Pettefer, reports that he "watched Mr. Johnson and his wife leading the pack on our board for volunteering, in particular, for Laundry Cares events." Brian Brunckhorst, a former Vice Chairman of the CLA, relates that Mr. Johnson "has donated countless hours of time and tens of thousands of dollars to the betterment of the laundry industry. He and his wife, Lisa, helped convince

lawmakers, in the state of Iowa, to forego imposing a sales tax on the self-service laundry industry because of its regressive nature of adding a tax to low-income individuals who use Laundromats to keep their clothes clean."

22. Mr. Johnson explained to the probation office that the customer base for laundromats is typically the most "economically disadvantaged," and that laundromats are often located in "minority neighborhoods." He described laundry as a "basic human need."

23. Mr. Grell reports that Mr. Johnson's "efforts over the years earned him the coveted award 'CLA member of the year' [and that] Daryl was subsequently voted by his peers to follow me as Chairman of the CLA." Mr. Johnson became Chairman of the CLA in 2021.

**Mr. Johnson's Charitable and Community Service**

24. Jeff Gardner, another past Chairman of the CLA, says that, when Mr. Johnson became a new member of the Board ten years ago, he "took on our fledgling project to creat[e] a 'Free Laundry Day' program to give laundry owners a way to promote their business while giving back to the less fortunate." He states that "[t]he design Daryl helped create was not focused on building the customer base but providing a connection to the most at risk in a community the laundry was serving." The program was "marketed to churches and homeless shelters focusing on the segment of the community that could not afford to do laundry."

25. The LCF created Read, Play, Learn Centers to provide the children of customers with access to books, reading opportunities and other activities while their parents launder clothing. Mr. Gardner explains that LCF launched this early childhood education initiative in 2016 and that "Daryl was the first to jump on board and promote the programming by buying our first version of literary centers for all of his laundries and promoting the concept to other laundry operators." James Whitmore, another past Chair of both the CLA and LCF, says that "no one out shone Daryl and his wife Lisa in their passion and dedication to these events."

26. Paul Pettefer confirms that Mr. Johnson and his wife "went at their own expense, to dozens of events and pre-event setups, where we put on free laundry days, which are a big community hug, where laundry owners open their stores for free laundry to the community." He adds that "[t]his has inspired numerous other volunteers to do more for their community all over the country!" Further, Mr. Johnson "has also worked for our Laundry Literacy initiative, to use laundromats to advance children's literacy around the country."

27. Mr. Gardner summarizes Mr. Johnson's charitable work as follows: "[o]ver the last ten years Daryl and his wife Lisa have spent thousands of hours and dollars to helping the neediest customers the laundry industry serves. I would guess that over 80% of that time and money was invested in laundries he had no connection to or would ever benefit one cent from." Mr. Grell concurs, stating that

"[n]o one in our industry has devoted as much personal time and money as the Johnson's." Mr. Gardner adds that, "while I do not condone Daryl's decision to enter the US Capitol on January 6th there are very few people I know who have given so much the [*sic*] help more people with no potential benefit to himself."

28. Mr. Johnson described his volunteer service to the probation office as "part of his DNA. It is 'just who [he is].'" But, since the instant offense," the defendant has removed himself from the foundation; he worries his conduct will 'hurt' the foundation."

**Marriage counseling**

29. In 1998, when Mr. Johnson was in his late twenties, he completed an internship in Colorado Springs, Colorado related to Biblical concepts and marriage counseling. He has served as a volunteer marriage counselor for many years. Dana and Howard Johnson (no relation to the defendant) are a Doctor of Pediatric Physical and a Chemical Engineer/MBA, who now live in Rock Island, Illinois. They received marriage counseling from the defendant in 2000. "He devoted his entire weekend working with us as he had done for so many other couples. He also volunteered seminars in various churches with his marriage ministry."

30. Steven Wood is a 64-year-old CPA and senior vice president of a major transportation company. He relates that "Mr. Johnson assisted my wife before I became introduced to her when she was undergoing a difficult divorce and

relocated to St. Ansgar, Iowa." Ultimately, " Mr. Johnson provided pre-marital counseling to my wife and me" and officiated at their marriage ceremony in 2017.

31. Lance Srp, a retired Navy Commander and commercial airline pilot, has known Mr. Johnson for over 35 years. He relates that, "[w]anting to help others, [Mr. Johnson] and his wife became certified marriage counselors and later financial counselors. Thanks to them, many marriages were saved and are now stronger."

**Helping friends and neighbors**

32. Brian Brunckhorst describes Mr. Johnson as "a good family man who cares deeply for his family and his community. If a neighbor or a friend is in need, Daryl is always the first person to help in any way he can. He is the kind of guy that would pull over to help a stranger change a tire, or neighbor mend a fence. That is just who he is."

33. For example, Paul Pettefer reports that, when Hurricane Laura ripped through Louisiana in August 2020 and damaged his business, Mr. Johnson "called me right afterwards, ready to gather a crew and come help me with demolition and to bring a roofing crew he was connected with to help." Mr. Johnson advised Mr. Pettefer "on things he learned from rebuilding his stores which were damaged earlier that year," i.e., two laundries in Minneapolis that had been destroyed in the riots following George Floyd's death.

34. Dana and Howard Johnson and Lance Srp report that the defendant and his wife took in a troubled friend of their daughter during high school to live with them.  They raised this young woman as their own.  In addition, they have also opened their home to foreign exchange students.

35. Mr. Srp also relates: "Daryl is a well-known supporter of our veterans. Any time the American Legion needs a volunteer, he is there. Every Christmas season for as long as I can remember, he has been placing wreaths on the headstones, and on Memorial Day he is there with flags doing the same."

36. Dana and Howard Johnson state that "Daryl has always given his time to others unselfishly.  He always has a smile on his face and an encouraging word."

**Mr. Johnson's Personality[1]**

37. As the foregoing discussion demonstrates, Mr. Johnson is an industrious, hard-working person.  He is family-oriented and a person of faith.  He is warm and charitable.

38. In addition, Mr. Johnson is a passionate and outspoken person.  His wife described him to the probation officer as "loyal," "opinionated," and "compassionate." His brother described him as a "hard worker," "vocal," and a "good guy."

---

[1] A number of people have commented on how Mr.  Johnson is viewed in the community.  See, Ex. 2

39. Brian Grell describes Mr. Johnson as a person of "energy, passion and enthusiasm." Daniel Jensen, who has known Mr. Johnson since high school, says that "[s]omething I admire about Mr. Johnson is that he is an extremely passionate person. Whatever he pursues, he pursues completely and with his whole being." James Whitmore says that "Daryl has always shown up as passionate, and outspoken (and maybe a bit cocky) … [an] honest, straight forward, what you see is what you get kind of guy." Whitmore notes that his relationship with Mr. Johnson "rose above our polar opposite political views, upon which we would often have playful but honest discussion and ribbing."

40. William Kettlewell, a retired Baptist missionary, has known Mr. Johnson for more than 30 years and watched him grow from a teenager into an adult. His perspective on Mr. Johnson is instructive: "In school, work, and marriage [Mr. Johnson] faced difficulties head on in such a way that he not only came out a better and more mature, young man, but was also able to pass on his experience by helping others who faced similar struggles."

41. Mr. Grell relates that, "[o]ver a 35-year career … [while he has] know[n] and work[ed] with many successful business owners, none have a bigger heart and willingness to serve than Daryl." He adds that "the events that took place on Jan 6th have had a huge impact on most of us and certainly on Daryl and his family.

I'm convinced if Daryl had a chance to do it all over again, he still would have attended the rally but would have exercised restraint from entering the Capitol."

**Mr. Johnson's Acceptance of Responsibility**

42. Mr. Johnson has accepted responsibility for his conduct on January 6 events. He has agreed as part of the plea to pay $2,000 restitution to the Architect of the Capitol, even though he did not commit any property damage nor was he accused of conspiring with anyone else to do so.

43. Mr. Johnson is unequivocal about his responsibility for his actions on January 6 and expresses genuine remorse for them:

> I have spent the vast majority of my adult life serving my community and giving back in any way I can. That is why my behavior on January 6th is so heartbreaking to me. I have no explanation nor any excuse. I was wrong to enter the capital and behave like I did. I simply am heartbroken; I know there is no way I can make amends. The only option I have is own my failure, ask for forgiveness, and pay the price required.

44. Mr. Johnson also regrets his son's involvement in these events and the fact that he didn't serve as a better role model that day.

**Comparable Defendants Sentenced to Probation**

45. As the Court knows, fewer than 10% of federal criminal defendants have a sentencing range in Zone A, and most Zone A defendants receive a sentence of probation. "Probation-only sentences consistently were the most commonly imposed alternative for offenders with sentencing ranges in Zone A, accounting for

approximately three-quarters of those sentences during the time period." *See* U.S.
Sentencing Commission, *Alternative Sentencing in the Federal Criminal Justice
System* at 7-8 (May 2015).[2] Congress has recognized that a sentence other than
imprisonment is appropriate for first offenders, like Mr. Johnson, who have not
been convicted of a crime of violence or an otherwise serious offense. *See* 28
U.S.C. § 994(j).

46. Mr. Johnson's conduct on January 6 was initially benign.  He came to
Washington to have his voice heard. He came here to demonstrate with thousands
of others who felt that they were being ignored by the leaders in our country. It was
only when a mob mentality set in that Johnson crossed the line and unlawfully
entered the Capitol. However, when viewed against all the other charged
individuals, his conduct is at the lower end of the spectrum. And the majority have
been sentenced to terms of probation or home detention. *See*, Ex. 3.

47. Mr. Johnson is a political protester who exceeded the limits of lawful
protest by entering the Capitol and helping others to do so. His conduct is
comparable to that of dozens or hundreds of other protesters in recent years. The
Government's treatment of those prior offenses confirms that they are minor

_____

[2] Available at *https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/alternatives/20150617_Alternatives.pdf*

infractions. In fact, they are usually treated as misdemeanors and criminal prosecution is dropped upon payment of a minor fine.

48. For example, in 2018, large numbers of protesters sought to block the confirmation of Brett Kavanaugh to the Supreme Court. During the Senate committee hearings in September, more than 200 protesters were arrested, of which 164 were arrested in the hearing room for interrupting the hearing.[3] The Women's March tweeted that "We're disrupting the Kavanaugh hearings every few minutes, with hundreds of women prepared to get arrested to prevent these hearings from moving forward."[4]

49. On October 4, 2018, with a confirmation vote looming, thousands of protesters marched from the Prettyman Courthouse to the Supreme Court. After rallying there, protesters affiliated with the Women's March had planned to "shut down" the Capitol building. The Capitol Police barricaded the area to prevent them from getting through, so the protesters, instead, proceeded to occupy the Hart and Dirksen Senate Buildings. A total of 302 protesters were arrested in those buildings.[5] Hundreds more protesters were arrested during the next two days.  On October 6, the day of the Senate vote, protesters "busted through police barricades

---

[3] *Update: Capitol Police Have Arrested More Than 200 Protesters At Kavanaugh Hearings*, dcist (Sept. 4, 2018), https://dcist.com/story/18/09/04/kavanaugh-hearing-arrests/
[4] https://twitter.com/womensmarch/status/1036993490125774848
[5] *Update: Police Arrest 302 Anti-Kavanaugh Protesters At Senate Building*, dcist (Oct. 4, 2018), https://dcist.com/story/18/10/04/huge-crowds-march-from-kavanaugh-co/

and took up residence on the Capitol Building's east steps."[6] Approximately 150

persons were arrested there.[7] Some protesters interrupted the Senate while it was in

session: on October 5, six protesters were arrested in the Senate Gallery;[8] On

October 6, 14 protesters were arrested and removed from the Gallery.[9]

50. Approximately 1,188 arrests were made between September and October

of 2018 in connection with the Kavanaugh protests. Approximately 503 people

were repeat offenders, meaning they were arrested on more than one occasion. In

fact, some of the repeat offenders were arrested as many as ten times during this

time period. All but one were charged with misdemeanors under the local D.C.

code.  Most were permitted to resolve these charges under D.C.'s "post-and-

forfeit" procedure, which allows a defendant to post and forfeit a sum of money

(typically $50), thereby resolving the criminal charge without any admission or

adjudication of guilt.  *See United States v. Tighe Barry*, 1:18-mj-00111-RMM,

ECF No. 10 (D.D.C. December 14, 2018).

51. The one protester against whom the U.S. Attorney's Office brought

federal charges was Tighe Barry, an activist with the liberal advocacy group Code

---

[6] Adam Rosenberg, *Brett Kavanaugh protesters ignore police barricades, occupy the U.S. Capitol*, Yahoo! News (Oct. 6, 2018), https://news.yahoo.com/brett-kavanaugh-protesters-ignore-police-194043428.html
[7] Tara Bahrampour, *Most of the protesters arrested during Kavanaugh confirmation have been released*, Washington Post (Oct. 8, 2018), https://www.washingtonpost.com/local/social-issues/most-of-the-protesters-arrested-during-kavanaugh-confirmation-have-been-released/2018/10/07/da7c76f0-ca46-11e8-a360-85875bac0b1f_story.html
[8] Press release, *U.S. Capitol Police Respond to Multiple Instances of Unlawful Demonstration Activities*, United States Capitol Police (Oct. 5, 2018), https://www.uscp.gov/media-center/press-releases/us-capitol-police-respondmultiple-instances-unlawful-demonstration
[9] Bahrampour, *supra* n. 6.

Pink. Barry, a frequent demonstrator with 14 prior arrests, had stood on a chair, held up a poster and shouted at senators during a hearing, and returned to protest three weeks later in violation of a stay-away order. The Government charged him with a federal misdemeanor and sought a 10-day sentence. (The court imposed 6 days).[10]

52. Mr. Johnson, in contrast, has been charged with a felony and required to plead to a felony charge. Since there is no dispute that his conduct violates that felony provision, and since the Government is unwilling to offer a more lenient disposition as it has in previous political demonstration cases, Mr. Johnson has entered his plea and will now be a convicted felon. The very fact of a felony conviction will punish Mr. Johnson significantly. Not only is it a blot on his reputation, but it will deprive him of the right to vote[11] and the right to possess firearms.[12] Mr. Johnson operates businesses that are primarily cash-based and at times transports large sums of money. He will no longer be able to carry a firearm for protection. Further, the felony conviction adversely impacts his ability to secure bonds or financing in connection with his businesses.

---

[10] Spencer S. Hsu & Tom Jackman, *Judge: Nonviolent Jan. 6 rioters should get 'serious jail time'*, Washington Post (Mar. 30, 2022).
[11] In Iowa, a person's voter registration is cancelled if the person is convicted of a felony.
[12] Iowa law, and federal law, prohibit a person convicted of a felony from receiving, transporting, or possessing a firearm.

53. The Government cannot credibly assert, however, that Mr. Johnson's offense conduct on January 6 was so serious that it merits a period of incarceration. That argument is belied by the Government's treatment of comparable, non-January 6 cases.

**Comparable January 6 defendants have received probation**

54. Furthermore, Mr. Johnson's conduct is comparable to that of other January 6 defendants who have received sentences of probation. (These other defendants were permitted to plead guilty to offered misdemeanor charges in contrast to the felony plea offer that Mr. Johnson received). Without attempting an exhaustive survey, the defense points to the following sentences imposed by this Court and other judges.

*Verden Nalley*

55. Mr. Nalley is a Georgia man who entered the Capitol building on January 6, and subsequently threatened (online) to come back "with guns" "in two weeks if [the election]'s not fixed." The Government requested a sentence of 14 days' incarceration, but this Court imposed a sentence of two years' probation and 60 hours of community service.

*Edward McAlanis*

56.  Mr. McAlanis is a Pennsylvania man who watched the events of January 6 unfold for several hours before entering the Capitol through breached doors and

remaining inside for 10-15 minutes. The Government requested home confinement, but this Court imposed a sentence of two years' probation and 60 hours of community service.

***Zachary Martin, Michael Quick, Stephen Quick***

57. Messrs. Martin, Quick, and Quick are three men from Missouri who entered the Capitol together on January 6 through a broken window. They were in the building for about 16 minutes and stood inside the Senate wing door while a crowd chanted "fight for Trump" as Capitol police were backed up against the wall. While inside, the Government said, Martin pushed his way through the rioters, live streamed a video on Facebook in front of a portrait of former New York Congresswoman Shirley Chisholm and "likely destroyed evidence by deactivating his Facebook page after many of his friends reported viewing his livestream message from the Capitol." The Government requested that the Court sentence Martin to 30 days' incarceration followed by 36 months' probation; that Michael Quick be sentenced to three months' home detention followed by 36 months' probation and 60 hours of community service; and that Stephen Quick receive two months' home detention followed by 36 months' probation, and 60 hours of community service. The Court sentenced Martin to three years' probation, and the Quick brothers to two years' probation, plus a $1,000 fine and 60 hours of community service for all three men.

***Danielle Doyle, Case 1:21-cr-00324***

58. Ms. Doyle, like defendant, entered the Capitol at about 2:20 p.m. on January 6 through a broken window next to the Senate Wing Door.  She remained inside for 2 - 25 minutes and walked through numerous areas of the building, including the Orientation Lobby, the Crypt, the Upper Orient Lobby, the Rotunda, and an interior staircase. The Government requested two months of home confinement and 36 months' probation, but Judge McFadden imposed a sentence of two months' probation and a $3,000 fine.

***William Blauser Jr., Case 1:21-cr-00386***

59. Mr. Blauser and a friend entered the Capitol at about 2:43 p.m. on January 6 by pushing past law enforcement. They remained inside the building for approximately 40 minutes. While inside, video showed they were involved in a skirmish with law enforcement in which Blauser lowered his shoulder against an officer. However, the prosecutor told the court that he believed Blauser was trying to keep his friend from engaging with police and was trying to extricate her from what was happening. Mr. Blauser, age 75, is a decorated veteran who serves as commander of his local American Legion post and spearheaded an effort to get a veterans' memorial installed in his community, which he continues to maintain. The Government requested three months of home confinement and 36 months' probation, but Judge McFadden imposed only a $500 fine (plus $500 restitution).

Judge McFadden accepted Blauser's remorse as sincere. He stated that the sentence would have been stiffer were it not for Blauser's unblemished record and reputation for service in his community. "We all make mistakes," the judge said, "and Jan. 6 was yours."[13]

**Mr. Johnson's personal history and characteristics call for leniency**

60. The fundamental task in sentencing is for the court to weigh "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The nature and circumstances of the offense have already been discussed. The remaining consideration is Mr. Johnson's history and characteristics. As discussed at length above, they are sterling. Mr. Johnson is a devoted family man, a good neighbor, and a good citizen. There is no need to protect the public from further crimes by him, nor is there any need to rehabilitate him. Mr. Johnson is entitled to benefit from the life he has lived when the Court determines the appropriate sentence in this case. His personal history and characteristics call for a lenient sentence.

---

[13] Paula Reed Ward, *Decorated veteran from McKean County, 75, gets fine for role in Capitol riot*, Trib Live (Feb. 3, 2022), https://triblive.com/local/regional/decorated-veteran-from-mckean-county-75-gets-fine-for-role-in-capitol-riot/

**Conclusion**

Mr. Johnson submits that a sentence at the low end of his guideline range is a *"sentence sufficient, but not greater than necessary"* to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

_____/s/_____
Christopher M. Davis #385582
Counsel for Daryl Johnson
Davis & Davis
1350 Connecticut Avenue, NW
Suite 202
Washington, DC 20036
202.234.7300

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of this motion was served on the United States via the Court's CM/ECF System on this 25th day of May 2022.

_____/s/_____
Christopher M. Davis