1                  BEFORE THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA

2

3    UNITED STATES OF AMERICA,     .
                           .  Case Number 21-cr-407

4          Plaintiff,      .
                           .

5       vs.                .
                           .

6    DARYL JOHNSON and         .
    DANIEL JOHNSON,          .  June 1, 2022

7                         .  10:06 a.m.
          Defendants.     .

8    - - - - - - - - - - - - - - - - -

9                TRANSCRIPT OF SENTENCING HEARING
          BEFORE THE HONORABLE DABNEY L. FRIEDRICH

10               UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the United States:    SAMUEL DALKE, AUSA
                          United States Attorney's Office

13                          228 Walnut Street, Suite 200
                          Harrisonburg, Pennsylvania 17101

14   For Defendant Daryl

15   Johnson:                CHRISTOPHER DAVIS, ESQ.
                          Davis & Davis

16                          1350 Connecticut Avenue Northwest
                          Suite 202

17                          Washington, D.C. 20036

18   For Defendant Daniel

19   Johnson:                ALLEN ORENBERG, ESQ.
                          The Orenberg Law Firm, P.C.

20                          12505 Park Potomac Avenue
                          Sixth Floor

21                          Potomac, Maryland 20854

22   Official Court Reporter:  SARA A. WICK, RPR, CRR
                          United States District Court

23                           for the District of Columbia
                          333 Constitution Avenue Northwest

24                            Washington, D.C. 20001
                          202-354-3284

25   Proceedings recorded by stenotype shorthand.
    Transcript produced by computer-aided transcription.

```
1              P R O C E E D I N G S

2        (All participants present via video conference.)

3            COURTROOM DEPUTY:  Your Honor, we are in Criminal

4    Action 21-407, the United States of America versus Daryl Johnson

5    and Daniel Johnson.

6        Representing Mr. Daryl Johnson, we have Mr. Christopher

7    Davis.  Representing Mr. Daniel Johnson, we have Mr. Allen

8    Orenberg.  Representing the United States, Mr. Samuel Dalke.

9    And Ms. Hana Field is representing Probation, and the defendants

10   are appearing by way of video.

11           THE COURT:  All right.  Thank you, Mr. Hopkins.

12       So before we can proceed by way of video conference, I

13   need, Mr. Davis and Mr. Orenberg, I know that your clients have

14   consented to sentencing being conducted by video conference, but

15   consistent with the CARES Act, I do need to make a finding that

16   this matter cannot be continued without serious harm to the

17   interests of justice.

18       And I assume that the desire to proceed by way of video

19   conference is based on the pandemic and the need to resolve this

20   case sooner rather than later, but if I can hear from both of

21   you.  I will start with Mr. Davis.

22           MR. DAVIS:  Certainly, Your Honor.  Mr. Johnson

23   consents to proceeding by video.

24           THE COURT:  And give me the reasons.  I need to make a

25   finding.  Is it because of the pandemic and the desire to
```

1    resolve the case quickly?

2          MR. DAVIS:  Exactly, Your Honor, that he agrees to

3    moving forward via video based on the circumstances attendant to

4    the COVID pandemic and also to expeditiously resolve the matter

5    pending before Your Honor.

6          THE COURT:  Okay.  Is that right, Mr. Daryl Johnson?

7    You understand you have the right to appear before me in the

8    courtroom for sentencing, if you desire, and I understand from

9    your attorney that you would like to proceed today by way of

10   video.  Is that right?

11         DEFENDANT DARYL JOHNSON:  Yes, ma'am.  Yes, Your

12   Honor.

13         THE COURT:  All right.  And Mr. Orenberg?

14         MR. ORENBERG:  Yes, Your Honor.  For the same reasons

15   Mr. Davis just informed the Court, Mr. Daniel Johnson also

16   waives his right to appear personally in court for sentencing

17   hearing.

18         THE COURT:  Thank you.

19      Mr. Daniel Johnson, you also understand you have the right

20   to appear before me for sentencing in the courtroom?

21         DEFENDANT DANIEL JOHNSON:  Yes, Your Honor.

22         THE COURT:  And is it your desire to waive that right?

23         DEFENDANT DANIEL JOHNSON:  Yes.

24         THE COURT:  Okay.  All right.  Consistent with the

25   CARES Act, we will proceed by way of video conference.

1        So I have reviewed the final presentence reports and

2   recommendations.  I've also read the parties' sentencing

3   memoranda, including the exhibits, the many letters submitted in

4   support of both defendants, as well as the government's

5   sentencing chart and videos.

6        Am I missing anything?  Mr. Davis?

7             MR. DAVIS:  No, Your Honor.

8             THE COURT:  Mr. Orenberg?

9             MR. ORENBERG:  Your Honor, I would just point out that

10   last evening, somewhat late, I filed an additional character

11   support letter.  I had inadvertently left it out of my main

12   package a couple of --

13             THE COURT:  And I read that; I read that.  From the

14   employer?

15             MR. ORENBERG:  Yes, Your Honor.  Thank you.

16             THE COURT:  Okay.  Thank you.  And I do appreciate

17   those letters very much.  That was very helpful to me.

18        All right.  Mister -- I don't have my reading glasses.  Is

19   it Dalke or Dalke?

20             MR. DALKE:  Dalke, Your Honor.

21             THE COURT:  All right.  I just want to make sure that

22   I mentioned everything that the government's provided.

23             MR. DALKE:  Yes, Your Honor, and just for

24   clarification, the three videos that were sent, I believe the

25   second and third video exhibits have audio.  Did that come

1    through for Your Honor?

2              THE COURT:  It did.  One was missing audio.

3              MR. DALKE:  Correct.  The CCV has no audio to it.

4              THE COURT:  Are you prepared to play those today?

5              MR. DALKE:  Since the Court has already seen them -- I

6    have them available, but I was not preparing to play them since

7    the Court's already had the opportunity to review them.

8              THE COURT:  Well, I would like you to, because it's

9    hard for me to spot the defendants in the videos.  Can you at

10   least play one of them so I can see -- the one that most clearly

11   reflects where they were in that scrum?

12             MR. DALKE:  Absolutely, Your Honor.

13             THE COURT:  All right.  We will do that in just a

14   minute, but let me make sure that we've gone through the

15   preliminary stuff.

16       So Mr. Davis and Mr. Orenberg, I take it you've reviewed

17   the presentence reports with your clients?

18             MR. DAVIS:  We have, Your Honor.

19             MR. ORENBERG:  Yes, Your Honor.

20             THE COURT:  All right.  And Mr. Daryl Johnson, you've

21   had a chance to review the PSR with your attorney, and you've

22   had adequate time to talk to him about it and correct any errors

23   in the report?

24             DEFENDANT DARYL JOHNSON:  Yes, Your Honor.

25             THE COURT:  All right.  And the same for Mr. Daniel

1    Johnson?

2              DEFENDANT DANIEL JOHNSON:  Yes, Your Honor.

3              THE COURT:  Okay.  Mr. Dalke, you have no objections

4    to the report?

5              MR. DALKE:  That is correct, Your Honor.

6              THE COURT:  All right.  And I know that --

7    Mr. Orenberg, I know you're making an argument that the criminal

8    history for Mr. Daniel Johnson is overrepresented, but aside

9    from that, you have no objections to the PSR; is that correct?

10             MR. ORENBERG:  That is correct, Your Honor.

11             THE COURT:  And the same for you, Mr. Davis?

12             MR. DAVIS:  That is correct, Your Honor, no material

13   objections, although I note that paragraph 54 indicated that

14   Daryl Johnson had a, I think it was, Missouri driver's license

15   and a traffic ticket from Missouri, and he's indicated that he

16   did not have that, a Missouri driver's license.  But I don't

17   think it affects these proceedings.

18             THE COURT:  Okay.  Ms. Field, do you have any response

19   to that?

20             PROBATION OFFICER:  Your Honor, we did note in our

21   response to defense counsel's objections that the information

22   about the Missouri driver's license was found an accurate

23   record.  It was associated with the defendant by matching his

24   Social Security number, his present residence, and his birth

25   date.  We did revise the report to include the date that the

 1     offense occurred, but we didn't change the report otherwise.  So

 2     I have no additional information to provide.

 3              THE COURT:  Okay.  Well, Mr. Davis, it's not a fact

 4     that in any way affects the sentence that I will impose in this

 5     case.  But do you have concerns about what's stated in the

 6     report?

 7              MR. DAVIS:  Not concerns, just that it's not accurate.

 8     Despite the AccuReports title for the database that it came out

 9     of, there's something amiss, but I don't think it impacts the

10     sentence here at all.

11              THE COURT:  Okay.  Well, Ms. Field, I assume Daryl

12     Johnson is a very common name.  I'm just wondering if this is an

13     error that should be corrected.

14         Does the government have a position on this?

15              MR. DALKE:  No position, Your Honor.  And again,

16     whether or not he had that driving infraction has no bearing on

17     the government's position or recommendation in the sentence.

18              THE COURT:  All right.  Ms. Field, given how common

19     this name is, my preference would be, I guess, to -- I don't

20     know.  I'm concerned that this is a different Johnson.

21              MR. DAVIS:  Your Honor, there's also -- in this age of

22     identity theft, there could be many explanations for why

23     paragraph 54 and 55 reflect what they do.  But Mr. Johnson has

24     indicated that he did not have a Missouri driver's license.

25         Correct, Mr. Johnson?

1      DEFENDANT DARYL JOHNSON:  That is correct.

2      MR. DAVIS:  So I would ask that it be stricken just so

3  that it doesn't perpetuate the confusion, and since it doesn't

4  impact anything, I think that it would be appropriate to extract

5  it.

6      THE COURT:  Ms. Field, given the circumstances, I

7  would ask that you make that correction, all right, that this is

8  disputed and may not be accurate.

9      PROBATION OFFICER:  Understood, Your Honor.  So would

10  you like us to strike that paragraph, then?  Is that what I'm

11  understanding?

12      THE COURT:  Yes, please.

13      PROBATION OFFICER:  Understood.

14      MR. DAVIS:  I think that would be two paragraphs.  I

15  think that would be 54 and paragraph 55.  Oh, no, I'm sorry,

16  paragraph 54.  I'm sorry.

17      THE COURT:  Okay.  Ms. Field, do you have that?  Any

18  questions?

19      PROBATION OFFICER:  No questions, Your Honor.  Thank

20  you.

21      THE COURT:  All right.  So with that correction, I

22  will accept the presentence report as my findings of fact

23  pursuant to Rule 32 of the Federal Rules of Criminal Procedure.

24      The parties agree with the presentence report that the

25  relevant guideline is 2A2.4(a) and the base offense level is a

1    level 10.  The parties further agree that the total offense

2    level, taking into account the two-level reduction for

3    acceptance of responsibility, is a level 8.  Because Daryl

4    Johnson has no criminal history, the parties agree that his

5    guideline range is zero to six months' imprisonment.

6         The parties agree that based on Daniel Johnson's prior

7    record, his criminal history category is II, which results in a

8    guideline range of four to ten months' imprisonment, though the

9    defense argues that a criminal history category of II

10   overrepresents his criminal history.

11        Have I accurately summarized the parties' positions here?

12   Mr. Davis?

13             MR. DAVIS:  You have, Your Honor, although I just

14   noticed that Missouri driver's license appears on page 3 of the

15   presentence report under the "Alternative IDs" section.  It

16   lists an Iowa driver's license, a Minnesota driver's license,

17   and then it lists a Missouri driver's license, and again, the

18   Missouri driver's license is the one that is in dispute.

19             THE COURT:  All right.  Ms. Field, can you make that

20   correction, please?

21             PROBATION OFFICER:  Yes, Your Honor.

22             THE COURT:  All right.  Have I accurately summarized

23   the parties' positions with respect to the guidelines?

24   Mr. Davis?

25             MR. DAVIS:  You have, Your Honor.

1            THE COURT:  Mr. Orenberg?

2            MR. ORENBERG:  Yes, Your Honor.

3            THE COURT:  Mr. Dalke?

4            MR. DALKE:  Yes, Your Honor.

5            THE COURT:  Okay.  All right.  I've independently

6    calculated the guidelines.  I do agree with the calculations set

7    forth in the plea agreement and the presentence report.

8         All right.  So before moving on, Mr. Orenberg, let me hear

9    your argument on the overrepresentation of criminal history.

10   I'm not inclined to agree with you here, but I will give you a

11   chance to make any additional points.

12           MR. ORENBERG:  Your Honor, I have laid out my

13   arguments on page 9 of my sentencing memorandum, which is

14   document 56, beginning on page 9.  With respect to the 2015

15   conviction for underage drinking and driving and a related

16   moving traffic offense, this conviction is almost nine years old

17   and, as I've pointed out, is the result of a set of minor

18   traffic infractions.  I'm asking the Court to observe that based

19   on the age of the conviction and the fact that it's a

20   misdemeanor, that the assignment of one criminal history

21   category point should be discounted.  It should not be taken

22   into account by the Court.

23        Now, with respect to the 2015 conviction for disorderly

24   conduct, it's my understanding that the arrest was the result

25   of, I'm going to say, a brouhaha between himself and his then

girlfriend and another gentleman.  According to Mr. Johnson, he
was very upset about, I'm going to say, the relationship or the
perceived relationship between his then girlfriend and this
other gentleman, and he became visibly and outwardly acted
upset, and the police were called.  Again, this is a
misdemeanor, and we're objecting to the assignment of one
criminal history category point.

And then the 2021 conviction for a small possession -- a
small amount of possession of marijuana, open bottle, and
driving after revocation and speeding, these again are all
misdemeanor convictions or citations with no active jail
sentence, and we again are objecting to the assignment of one
criminal history category point.

Your Honor, all of these convictions, these three separate
offenses, were, you know, misdemeanors.  And it's my argument
that, accordingly, the criminal history category assignment of
II overrepresents the actual seriousness of his criminal
history, and we're asking the Court to find that he's a criminal
history category I.

THE COURT:  All right.  Mr. Dalke, any response you
would like to make beyond what you've stated?

MR. DALKE:  Briefly, Your Honor.

I will say, he got three criminal history category points.
So even if one of these three were discounted, he would still be
criminal history category II.  So to drop him to criminal

history category I, you would really have to discount two out of
these three offenses.

They did all happen in the past ten years.  One of them, as
noted, did involve disorderly conduct as well as a sentence of
30 days, although it appears that 28 of those days was
suspended.  So effectively, he served two days in prison, likely
time served, followed by a year of probation.  And that one did,
it appears, involve some threats and some disturbance in a
public space.

I think where the government comes down is I don't think
it's overrepresentation of criminal history II because he's been
in the criminal justice system before and now has come back
before this Court and committed additional -- after committing
additional offenses.  So we're not jumping up to III or IV or
VI.  It's one bump up in the guidelines.  He did commit those
three offenses.  It is appropriately calculated.  And I don't
think there's an overrepresentation here.

THE COURT:  Mr. Orenberg, I'm inclined to agree with
the government.  If we were talking about two criminal history
points, I might agree with you, but we're talking about three
here, and I am troubled about the -- his record as a whole.  I
know there's also some uncharged driving on suspended license
and the like.  I'm just concerned.  I don't think that Daniel
Johnson's record is reflective of criminal history category I.

So I will -- to be clear, you were seeking a departure or

1    just a variance?

2            MR. ORENBERG:  A variance, Your Honor.

3            THE COURT:  Okay.  All right.  I will -- I'm not going

4    to grant that motion, if you will, to reduce the criminal

5    history category from a II to a I.  So we are looking at a

6    guideline range of four to ten months.

7        Let me go ahead and start with the government.  Mr. Dalke,

8    like I said, I would like to see -- I don't need to see all

9    three videos, but one or two that best reflect where the

10   defendants were in relation to the crowd.

11           MR. DALKE:  Yes, Your Honor.  Would you like to start

12   with that, or would you like an allocution and I can kind of

13   work that in?

14           THE COURT:  If you can start with the video, that

15   would be most helpful.

16           MR. DALKE:  Absolutely.  So bear with me while I share

17   my screen.

18       Your Honor, do you see a video up on the screen?

19           THE COURT:  Yes.

20           MR. DALKE:  Okay.  And this is Government's Exhibit 1,

21   which is a video that is approximately 3:56 in length.  It was

22   taken from the Capitol's CCV system.  So it doesn't have sound.

23   I provided the other videos to provide a context of the sounds

24   and what was going on that day.  But this is the video that, in

25   the government's view, kind of best shows, you know, the actions

1    of both Johnsons at approximately 2:37 and 2:38 p.m. on

2    January 6.  So I'm going to play, and then I will pause it when

3    the Johnsons enter the screen.

4        (Video played.)

5            MR. DALKE:  And the Johnsons enter the screen at

6    approximately 0:43 into the video, but in this video, you can

7    see the east rotunda doors which are to the right, and you can

8    see the police officers standing in front of it, including an

9    officer with a face shield.  There were three police officers

10   standing in front of that door.

11           THE COURT:  Mr. Dalke, you will make this video

12   available on the public database?

13           MR. DALKE:  Correct, Your Honor.

14       And to the left side of this video where some of the

15   rioters are opposite the door, that's where the rotunda is.

16       And I just paused it there.  Daryl Johnson just came across

17   the screen between the pillar and the wall.  You can see him

18   right there.  He's wearing a hat, and there's a backpack.

19           THE COURT:  Wait.  Hold on.  Between the pillar and

20   the wall?  The wall closest to us?

21           MR. DALKE:  The wall closest to the left, which is the

22   rotunda side, and then there's a column.  There's a woman at the

23   top, and then there's a gentleman right beneath the woman

24   wearing a backpack and a hat.

25           THE COURT:  All right.  So not the gentleman with the

flag, but one in between the column and the wall right now?

MR. DALKE:  Yes.  And I can back up a second, and I will just play it, and then I can rewind it 5 seconds, and you can see both Daryl and Daniel Johnson in that space, and you're also going to see them in a space yelling in the direction of the doors.  That's Daryl Johnson cupping his hands and yelling, and Daniel Johnson -- I've paused it here again 0:50 into the video -- is wearing a tan hat with sunglasses on top.  He was just right next to his father, Daryl Johnson, and he also yells.

And then they disappear behind the column, and you will see them more clearly now, 0:56 into the video, right above that blue flag that's being waved, again Daryl Johnson in the black hat with the white letters and backpack and Daniel Johnson in the tan hat with the sunglasses and has the bandana.

And then they move forward, Your Honor.  So 1:12 into the video, Daniel Johnson opens up his arms and yells "forward" again towards the police officers' line and the door.  His father is behind him.

THE COURT:  Can you point with the cursor where they are?

MR. DALKE:  If you can see my cursor, they're right here now.

THE COURT:  Okay.

MR. DALKE:  In total, by the government's estimation, I think they're about 30 or 40 seconds in this space before the

push starts.  And again, that's where you can see Daniel Johnson
yelling.

And there the push begins.  So you can see Daniel Johnson
and Daryl Johnson both pushing.  This is 1:38 into the video.
Daniel Johnson turns around and pushes with his back for more
leverage.  They move up here to the apex.  They cross the
threshold of the door.  The doors open up.

THE COURT:  Where are the police officers right now?
Between the crowd and the doors?

MR. DALKE:  Yes, Your Honor.  And then they come over
here.  So then here -- and I will pause here 2:00 into the
video.  After they come back off the top side -- so they push.
They beat the apex.  They breach the doors with a group of other
rioters.  They come back up on the top side of the video, and
then they walk down towards the bottom of the video where
there's a set of stairs, and they go up those stairs.  And you
can see them raising their fists, pumping their fists at this
point, as well as yelling and kind of motioning or pointing
towards heading up the stairs.

THE COURT:  Okay.

MR. DALKE:  There you see them pointing, heading up.
And right about 2:10 into the video, they depart this screen and
head up the stairs.

And the last thing I will note since we have this video
already up, if I move it forward towards the end of this clipped

1    section, this is just a minute and a half later, you can see the

2    number of rioters kind of streaming through those doors once

3    they're opened and breached.  And again, these doors, these east

4    rotunda doors directly go out to the east front of the Capitol.

5    And I will talk about it later in my allocution, but this was a

6    major breach point in the events of January 6.

7         Your Honor, while I have this video up, are there any

8    particular sections you would like me to go back and play or

9    point out?

10            THE COURT:  No.  That was helpful.  There's no need to

11   play another one.

12        Mr. Dalke, let me ask you, the government has done a good

13   job of listing a number of specific cases in its sentencing

14   memorandum that the Court should view as analogous.  With the

15   exception of the Mostofsky case, all of those were charged as

16   misdemeanors, and initially, I think, in this case the

17   defendants were charged with misdemeanors.

18        Can you help me understand how their conduct differs from

19   those defendants such that the government -- I know this isn't

20   the role of the Court.  I'm just curious why these defendants

21   and not the others were charged with the felony civil disorder

22   offense.

23            MR. DALKE:  Certainly, Your Honor.  And I will say at

24   the outset, as the Court noted, the Mostofsky case is the only

25   other 231 case, at least with the lead charge, that I'm aware of

1    that has gone to sentencing.  And so that's certainly why we

2    believe it has some bearing on this Court's decision today.

3        The three others that I picked out and highlighted to the

4    Court are all misdemeanor cases.  And I need to be clear at the

5    outset, that's no reflection that we view this as a misdemeanor

6    case, and there are distinguishing points on those cases.  The

7    reason I provided those three in particular is because they all

8    centered on that same east rotunda door.

9        THE COURT:  No, understood.  But why weren't those

10    defendants charged with the felonies?

11        MR. DALKE:  Sure.  So Frank Scavo, which was Case

12    Number 21-cr-254, he was outside during that push.  So unlike

13    the Johnsons, he did not engage on that interior push against

14    that line of police officers.  So the 231 charge for his case,

15    in the government's view, at least in my view, would not be

16    appropriate, because he didn't actively participate in that

17    breach, actively participate in interfering with those three

18    officers who were essentially sandwiched between the interior

19    rioters and the exterior rioters.

20        THE COURT:  Were there officers on the outside of the

21    Capitol building as well?

22        MR. DALKE:  My understanding is yes, there were, Your

23    Honor.  I'm not sure at that exact moment, but certainly, at

24    times, there were altercations and incidents with officers in

25    proximity to those doors on the outside.

1          THE COURT:  But they weren't sandwiched between the

2     crowd and the doors like the officers on the inside?  Is that

3     what you're saying?

4          MR. DALKE:  I haven't seen all those videos.  I'm not

5     sure exactly what happened.  I will say that, you know, if you

6     sandwich an officer between the outside doors, the doors don't

7     open inward.  They open outward.  And that's critical to the

8     Johnsons' conduct and why this particular breach was so

9     relevant, is they were again inside the Capitol, entered with

10    the mob on the west front, and then went and allowed the mob on

11    the east front to enter through those doors by knocking them

12    open, by pushing them through.

13         So yes, I provided those other cases as comparables because

14    they involved the east rotunda doors, but I don't think it's

15    fair to say the conduct of those rioters on the outside who were

16    not involved in the breach of the doors -- they were ready and

17    willing and wanted to go in.  There's no question.  You can see

18    those rioters streaming in after the doors are breached.

19         But it's -- the conduct that is most egregious on the

20    Johnsons' part is the breaching of those doors from the inside,

21    and that's what led to the 231 charge, and that's why I think

22    it's appropriate, and that's what, frankly, distinguishes it

23    from those cases, both the Mark Simon case and the Frank Scavo

24    case.

25         THE COURT:  Okay.  Simon was outside as well?

1          MR. DALKE:  Yes, Your Honor.

2          THE COURT:  And Smith?

3          MR. DALKE:  So Smith was inside.  Smith was inside,

4    and he was more -- I will say he was more similarly situated to

5    the Johnsons than Scavo or Simon.  He can be seen on that video

6    that I just showed Your Honor.  I can bring it back up, and I

7    can point him out if you would like.

8          He was there before them in that area outside the east

9    rotunda doors.  There were some iron benches that law

10   enforcement had put in front of those doors.  I think there's

11   two or three of them.  And he went and moved them.  Officers saw

12   this, and they took him away and put the benches back.

13         He later then returned with a group of rioters and -- as

14   depicted on the screen with Government's Exhibit 1 that Your

15   Honor just watched, and he did join in the push at that door.

16   However, he was late to the push.  So he was several individuals

17   back behind the Johnsons.

18         Essentially, they again made it to the apex, they made it

19   really to that threshold, if not past that threshold.  I don't

20   have a video showing that they, meaning the Johnsons, put their

21   hands on an officer, but they were close.  They were close.  And

22   if you take it in proximity to Jeffrey Smith who was multiple

23   people back, he had a much bigger physical distance between

24   himself and the doors.  He then was -- followed the Johnsons,

25   meaning he was after them when they kind of raised their fists

1    and pointed upstairs and yelled to go upstairs.  He was

2    following them, trailing them up those stairs.

3        But I do candidly admit, there are some similarities in his

4    case, and he received 90 days.  He received 90 days'

5    incarceration, which again is what the government asked for for

6    Daryl Johnson.

7                THE COURT:  But why wasn't he charged with a felony?

8                MR. DALKE:  Your Honor, I --

9                THE COURT:  As we look at these cases, we want to be

10   consistent, and that's a big discrepancy here that isn't clear

11   to me, why the charging decisions are so disparate.

12       Is there an effort to review these at a higher level to

13   make sure similarly situated defendants are treated similarly?

14               MR. DALKE:  Certainly, Your Honor.  As the Court is

15   aware, there's over 800 cases charged.  We're doing the best we

16   can to keep similarly situated defendants with similar charges

17   and with similar guilty pleas.  Certainly, there is evidence

18   that we continue to uncover as to additional defendants.

19       I'm not intimately familiar with the Jeffrey Smith case.  I

20   did not handle it.  I have read all the briefs.  I'm familiar in

21   that sense.  But as far as the charging and plea decisions in

22   that case, again, I'm not sure how they got to where they got.

23   But I will say we are being consistent, Your Honor, in that we

24   are asking for sentences substantially similar to that case.

25       I do think, as already outlined by the Court, that the

conduct of Daryl and Daniel Johnson is more egregious than that
of Jeffrey Smith.

THE COURT:  Smith moved these iron benches.  That's at
another location?

MR. DALKE:  No, that's these doors, Your Honor.

THE COURT:  Arguably, that's more egregious than what
these defendants did.

MR. DALKE:  No, Your Honor, I don't think moving iron
benches which are unguarded at the time is more egregious, and
then the police officers confronted him, and then he moved away.

THE COURT:  He did that, and then according to the
government, he helped the other rioters overwhelming the police
officers by sandwiching them between the rotunda doors.  You're
saying he was farther behind them, but he was involved in that
conduct as well.

MR. DALKE:  Correct, Your Honor, he was.  He was
farther behind, but he was involved in that push.

THE COURT:  Am I correct that these defendants
initially were not charged with a felony but there was a
superseding information?

MR. DALKE:  That is correct, Your Honor.

THE COURT:  And why is that?  Is that based on the
government's review of the video?  What changed?  I don't quite
follow how we got where we are.

MR. DALKE:  Yes, Your Honor.  I think -- and again,

1    having not been the attorney from the start, my understanding in

2    this case is they were initially charged with misdemeanor

3    trespass offenses because that's what the evidence showed.  That

4    was the evidence that we had at the time.  As the case went on,

5    as we searched the phones, as we recovered additional video, we

6    uncovered this push and their statements that they made after

7    January 6.  And in the government's view, the best charge for

8    their conduct bumped up to the 231.

9         And there is no question in the government's mind in this

10   case.  This is not a misdemeanor case.  This is not misdemeanor

11   conduct.  This is felony conduct.  And I think as can be shown

12   in Exhibits 2 and 3 of the video exhibits that the government

13   showed, I mean, the chants going on, the sounds, the sirens, the

14   sandwiching of those officers, I mean, this was violent conduct.

15        THE COURT:  No, I can understand the charge.  I just

16   don't understand the disparate treatment.  Are you telling me

17   that the government in other cases -- there's a large mob there.

18   Other cases involving other defendants who are in that mob are

19   also being re-evaluated in the way these defendants were?  Is

20   that what you're telling me?

21        MR. DALKE:  Your Honor, I'm not sure if I follow.  I

22   mean, these defendants were re-evaluated when the government

23   found additional evidence against them that showed they were

24   involved more than the government previously knew.  And so

25   that's why we moved from the misdemeanor to the felony charge.

1      And certainly, I think in any case where the government

2  finds additional evidence, there's going to be that discussion.

3          THE COURT:  Is the additional evidence the statements

4  made after the fact or the degree to which they were involved in

5  pushing the mob towards the officers?

6          MR. DALKE:  Both, Your Honor.  My understanding is

7  when these defendants were initially charged, we weren't aware

8  of their involvement in that push.  As we just showed this video

9  to Your Honor, it's not abundantly clear from watching the video

10 that it's Daryl and Daniel Johnson.  You have to spend some time

11 and take some time, and this video was discovered after further

12 review of the videos and the evidence, and that's why we brought

13 the 231 charge later as opposed to initially at the outset when

14 we weren't aware of all the evidence.  We weren't aware of all

15 the actions of Daryl and Daniel Johnson at the time of the

16 initial misdemeanor complaint.

17         THE COURT:  So is it fair to say to the extent the

18 government identifies other individuals who are in that scrum

19 pushing against the doors where the officers are sandwiched,

20 that those defendants also would be charged with felonies?

21         MR. DALKE:  Certainly, Your Honor, yes, that would be

22 my recommendation.

23         THE COURT:  But not just your cases.  Your

24 understanding is the government re-evaluates as a whole these

25 cases as they get additional evidence?

1        MR. DALKE:  That is my understanding, yes, Your Honor,

2    that if additional evidence is being uncovered -- and it is.  I

3    mean, I have certainly over a dozen of these cases, and every

4    week, every month, I'm finding new videos.  My agents are

5    finding new videos.  We conduct a new search warrant, and we

6    find a new phone from a different defendant, and that phone from

7    additional rioters shows new conduct not just of that rioter but

8    of other rioters around them.  So we do uncover new evidence of

9    assaults.  We do uncover new evidence of bad conduct.  And

10   certainly, we are taking that into account.  We're doing the

11   best that we can, given the large number of defendants and

12   trying to be, to the best that we can, you know, fair and

13   evenhanded with all of the defendants.

14        THE COURT:  Okay.  All right, Mr. Dalke.  I will go

15   ahead and let you allocute.  Thank you for clearing all that up.

16        MR. DALKE:  Your Honor, the government is asking for a

17   term of imprisonment in the cases of Daryl and Daniel Johnson,

18   and we're asking for a term of imprisonment because it's

19   warranted in this case.

20        On January 6, the Johnsons took part in an unprecedented

21   attack on the United States Capitol, an attack on law

22   enforcement officers, and an attack on democracy itself.  To

23   paraphrase a colleague, on that day, thousands of people were

24   brought together by the lie of a stolen election, and they

25   marched on the United States Capitol.  They pushed over

barricades.  They assaulted police officers.  And they breached the Capitol building.  And this hostile takeover was timed.  It was timed to force an interruption of the certification of the 2020 Electoral College vote count.  There's simply no question that this conduct is a direct, serious assault on both the rule of law and on the peaceful transfer of power.

So while the events of January 6 are incomparable, it's -- the conduct of the rioters, however, does cover a broad spectrum.  As already outlined by this Court and as I want to delve into today, the issue is where do the Johnsons' conduct fall in comparison with some of the other rioters.

And so there's three significant points that the government wants this Court to be aware of when comparing the Johnsons' conduct.  First is their time, their place, and their method of entry.  The second is the actions that the Johnsons took once they were inside; once they breached into the Capitol, what did they do.  And third is the statements that they made on social media after January 6.

In the government's view, it's these three points, taken together with the rest of their conduct, that makes clear that again this is not a misdemeanor case, this is not misdemeanor conduct, and that the Johnsons each committed a serious felony offense and should be incarcerated.

So first is the time, the place, and method of entry.  The Johnsons entered at 2:20 p.m., which was only seven to eight

1   minutes after the initial breach of the Capitol.  Their entry

2   can be shown on images 1 and 2 of the government's sentencing

3   memorandum.  And they didn't walk through a door.  They didn't

4   walk through an open door.  They jumped through a smashed-out

5   window on the west front of the Capitol.

6   And as this Court is uniquely aware, the west front of the

7   Capitol and those northwest scaffolding is where a significant

8   amount of violence and confrontation occurred.  In fact, it was

9   the focal point of the Guy Reffitt trial.  And it's impossible

10   for the Johnsons to have entered when they did and where they

11   did without seeing active police resistance, without witnessing

12   violent clashes, without hearing chants, without watching

13   rioters overrun the police and smelling the pepper spray.

14   And in fact, on the CC video -- and this is image 3 in the

15   government's sentencing memorandum -- you can see the Johnsons

16   pouring water onto another rioter's eye once inside the Capitol

17   like we do the OC spray.

18   Daniel Johnson, later that day after leaving the Capitol,

19   bragged that "I was one of the first ones inside."  So they

20   weren't the first individuals inside.  That happened at around

21   2:13 p.m.  But at 2:20 p.m., they were still a part of that

22   first wave, that violent wave up the west front.  And again,

23   it's impossible for them to have gotten from the Peace Monument

24   and outside the bottom of the steps, through all those rioters

25   and up and through the Senate window without being a part of

1    that initial push up those steps and through those doors.

2         They could have turned back at any point, but they didn't.

3    They chose to advance.  And they chose to be on the front line

4    of the hostile takeover at the Capitol.

5         And the last thing I will note on the timing of their

6    entry, which was 2:20 p.m., it was the exact same time that

7    members of both the House and Senate were instructed and did

8    evacuate their chambers and the Joint Session of Congress was

9    suspended.

10        So second, I want to talk about the actions of Daryl and

11   Daniel Johnson once inside the Capitol.  So as already shown to

12   the Court in Government's Exhibit -- video Exhibit 1, at

13   2:37 p.m., so approximately 17 minutes after entering the

14   Capitol, the Johnsons encountered three police officers who were

15   guarding the east rotunda doors.  And those images can also be

16   shown in images 5 through 13 in the government's memorandum.

17   Initially as shown on Exhibit 1 video, the Johnsons are yelling,

18   and they join in yelling at the officers.  And you can also see

19   in those videos, and you can see from the Johnsons' actions,

20   that they're looking directly out those windows where additional

21   rioters were amassed outside the Capitol.

22        I'm not going to play for the Court since the Court has

23   already seen it, but I do want to talk about Exhibits 2 and 3

24   which were submitted by the government.  These were videos taken

25   by nearby rioters that match up with the timing of Exhibit 1,

which was the CCV video which shows the overall.  Exhibits 2 and
3 kind of show the chaos, the mayhem, and they show the rioters
trying to get in from the east side of the Capitol.  They show
the officers protecting the door.  And they provide a sense of
the scene that was initially encountered by the Johnsons at
2:37 p.m.  You can hear the alarm ringing in the background, and
you can hear rioters yelling.

Now, remember, the Johnsons were yelling.  I don't know
what they said.  I don't know what they yelled.  But you can
hear others yelling.  And it may have been them, or it may have
been other rioters at the same time.  You can hear them yelling,
"Open the door."  You can hear them yelling, "Let them in."  You
can hear them yelling, "Get out of the way.  Your life is not
worth it.  Push.  Push.  Push."

At that moment, the Johnsons didn't leave, but they joined
in.  They advanced on the officers.  They pressed forward, and
led by Daniel, they forcibly pushed and shoved forward in the
group, sandwiching the officers and forcing the doors open.

Again, in the government's memorandum, it's depicted in
images 10 through 17, as well as video Exhibits 1 and 3.  It's
important that both of the Johnsons, both Daryl and Daniel,
pressed forward.  Daniel turned his back at one point and
presses for more leverage against the other rioters and against
those doors and officers.  And those doors were forced open, and
those officers were shoved aside and they were discarded.  In

particular, in Exhibit 3, you can see the officer being

sandwiched on that door.  You can see his helmet being knocked

askew.  You can also see a different officer limping away down

besides the doors, discarded, shoved out to the side.

But there wasn't remorse after that attack.  What you see

is you see celebratory fist pumps, victory pumps, shouts, points

to go upstairs.  With their work done, they headed upstairs.

And it's important for the Court to understand the context

of this push against the doors, the east rotunda doors, because

the effects of the Johnsons' actions and the other actions

involved in that push was felt in the Capitol that day well

after they left both the scene and even after they left the

building.  The crowd, as shown in Exhibit 1, I showed the Court

just a minute, minute and a half after the Johnsons joined in

that push.  You can see the crowd streaming in two or three

abreast through those doors on the east side of the Capitol.

And that continues for about 30 minutes.  Not until about

3:10 p.m. that officers were finally able to get those doors

shut again.  And you will see people with tactical helmets, riot

gear, gas masks going up through those doors.

And over the next 45 minutes, there's a series of

conflicts, assaults, disorders that occurred in that rotunda

space, at 3:00 p.m., at 3:10 p.m., at 3:25 p.m.  So again, the

Johnsons weren't a part of that.  In fact, they had already left

the Capitol at that time.  But their work had been done.  They

1    had essentially joined the Capitol breach from the west front

2    and then helped the east front mob breach as well.  Essentially,

3    at that point, after 2:38 p.m., after that second, you know --

4    it wasn't the second breach point, but after that east front was

5    opened up to rioters, you have law enforcement officers dealing

6    with two major breaches on both sides of the Capitol that didn't

7    exist before Daryl and Daniel Johnson's conduct.

8        A mob can only succeed because of its numbers, and that's

9    one of the most alarming things in this case, is that the

10   Johnsons were not just a part of the mob.  They actually enabled

11   the mob, enabled the east front mob to get in the Capitol in

12   large numbers.

13       And third, I want to talk about the statements the Johnsons

14   made on social media after the riots.  There are post-riot

15   statements that show both Daniel and Daryl Johnson were proud of

16   their actions.  Daniel Johnson, on January 6 after leaving the

17   Capitol, engages in a Snapchat conversation saying, "I was one

18   of the first ones inside.  It was fucking wild.  I was trying to

19   find a way into the chamber."  Daryl Johnson makes similar

20   comments, public comments on Facebook the following day, saying,

21   "Yesterday will be the beginning of a revolution.  There will be

22   hangings on the front lawn of the Capitol.  That crowd was not

23   messing around," meaning the crowd that he was just a part of.

24   A week later, Daryl Johnson said, "It's going to get very ugly

25   and turn into some version of a civil war."

1    The government openly admits that Daryl and Daniel Johnson,

2    after being arrested, after being charged, expressed remorse,

3    expressed regret, but it's these comments that they made in the

4    days and the weeks after January 6 that show their actual

5    intent, that they were trying to find a way into the Senate

6    chamber, that they wanted to start a revolution, that they were

7    a part of a violent crowd that wasn't messing around.

8    So with those three points highlighted to the Court, it

9    becomes clear that a period of probation or a period of home

10   confinement is simply inadequate in this case.  It wouldn't

11   account for the seriousness of the offense.  It wouldn't account

12   for the aggravating factors.  It wouldn't provide adequate

13   deterrence, and it would result, in the government's view, in a

14   sentencing disparity from similar cases, certainly from the only

15   other 231 case, Mostofsky.

16   And as highlighted in the memo and already discussed with

17   this Court, the government does believe the conduct of the

18   Johnsons is more egregious than the other misdemeanor cases that

19   have been before other judges involving the east rotunda doors.

20   They weren't minor participants, and they were not among the

21   least culpable on January 6.  Their conduct and their words show

22   otherwise.  They were both willing and active participants that

23   joined a very violent mob on the west front and then helped a

24   second mob on the east front also gain access to the United

25   States Capitol.  And they didn't just push aside a metal

barricade or open an unguarded door.  They helped to rush a line

of police officers and enabled hundreds of rioters to enter and

further the insurrection.  Then they celebrated their conduct on

social media.  There's no doubt they committed serious felonies

and should receive prison terms.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Dalke.  In terms of the

relative culpability of Daryl Johnson and Daniel Johnson, how,

if at all, would you distinguish the two?

I think Daniel was the first to enter.  He was the first to

step forward towards the doors.  He was the one who tried to

unlock the door -- or open the door, rather, upstairs.

How does the government view the respective evidence for

each?

MR. DALKE:  Yes, Your Honor.  And there's no doubt

they are similar.  They were both in for 26 minutes, and from

what the government can tell -- I don't want to say they were

inseparable, but they were together for that whole duration.  I

do think there are the small differences already pointed out by

the Court, Daniel being in a couple instances the first, you

know, ahead of his father, the first one kind of to step

forward, the first one to yell, the first one to -- at least

between the two of them, to join the push, the first to go

through the window.  I do think he has a statement about

attempting to find a way into the chamber.  He did use his back

1    for additional leverage.

2         And it's already been discussed at the outset, but I don't

3    think his criminal history is significant, but it is something

4    that is factored in, and it was factored in both to the

5    sentencing guidelines as well as the government's recommendation

6    that Daniel Johnson, unlike his father, who has a clean record,

7    Daniel Johnson does have a couple of offenses, including a

8    disorderly conduct offense.  He has been sentenced by judges

9    before.  He knows what can come of bad acts, and he went for it

10   anyway.

11        So I think those, although very similar, I do think there

12   are some differences that warrant a slightly higher sentence for

13   Daniel Johnson as opposed to Daryl Johnson.

14             THE COURT:  All right.  Thank you.

15        Mr. Davis?

16             MR. DAVIS:  Thank you, Your Honor.  And I would like

17   to emphasize what Your Honor just inquired about, how do you

18   distinguish the two, because although they're father and son and

19   I'm certain the father loves his son very much, I don't think

20   you're sentencing a pair.  I think you're sentencing an

21   individual here, and you have to look at individual actions.

22        During the government's allocution, I heard repeated

23   references to violence.  However, I have not seen photographs of

24   violence engaged in by Daryl Johnson, and I don' really think

25   the videos demonstrate violence on behalf of Daryl Johnson.  And

1    he didn't plead guilty to violence.  He pled guilty to

2    interfering with law enforcement.  He pled guilty to basically

3    interfering with them performing their job, in other words

4    keeping others out.

5              THE COURT:  Mr. Davis, let me stop you there.  How can

6    you watch that video and not say that that is attempted assault

7    if not assault?

8              MR. DAVIS:  Well, I mean, I can distinguish it very

9    easily.  As I look at it -- first of all, there were references

10   about a crowd was yelling.  There's nothing to indicate --

11             THE COURT:  Well, stop on the yelling.  I'm talking

12   about the physical actions of the two defendants.  How can you

13   say it's not an actual assault and attempted assault there with

14   the officers sandwiched between the doors and the crowd?

15             MR. DAVIS:  Well, I mean, first of all, Mr. Johnson is

16   in the back initially, and if you notice when you watched that

17   video, when the actual push takes place, a man comes up behind

18   Daryl Johnson and Daryl Johnson's son, puts his hands on their

19   back, and pushes them forward.  Within those few seconds

20   afterwards, the crowd surges forward and quickly dissipates.

21             THE COURT:  And then they pump their fists afterwards.

22             MR. DAVIS:  Is it a pump of fist, or is it a point in

23   direction, we're going that way, because they went that way

24   shortly thereafter.  They couldn't go out the doors that opened.

25   They went up the stairs.  Mr. Johnson went up the stairs, and he

1    exited the building.

2         I think there's a difference.  I mean, I look at one of the

3    cases we were talking about a little bit earlier, Jeffrey Smith.

4    I mean, Jeffrey Smith -- no, it isn't Smith.  Yes, Jeffrey

5    Smith.  I mean, he got right up in the face of the officers that

6    were blocking the door.  He got inches from them and screamed,

7    "Stand down.  We're getting in there one way or another."  And

8    it was unclear whether he actually physically assaulted anyone.

9    During the course of his presence in the Capitol, he was sending

10   out electronic messages pointing out how he was a patriot who

11   stormed the Capitol.

12        There's nothing like that on Mister --

13        THE COURT:  Mr. Davis, I want to make sure I

14   understand your position.  Let's just focus solely on Daryl

15   Johnson.  Is it your position absent the individuals behind him

16   pushing him forward, that he would not have been a part of that

17   scrum?  Is that what you want me to take away from the evidence

18   that I've seen, that he was pushed against his will towards the

19   officers who were defending --

20        MR. DAVIS:  I don't know if you can say it's against

21   his will, but I don't think it was his idea to push.  I mean, he

22   got pushed, and then --

23        THE COURT:  He walked forward before anyone --

24        MR. DAVIS:  He walked forward, but he didn't push.  He

25   walked forward, and that man came up, put his hands on their

back, pushed them forward, and the whole crowd surged forward.

And we're talking a matter of seconds.  It's very easy to be a next morning quarterback and decide what should have been done during the game the night before.  You have to take into consideration, these were split-second things that happened, and they happened for seconds.

I don't think that Mr. Johnson approached those doors with the intent to attack the officers there.  I just don't think that's the case.  And even when you look at that --

THE COURT:  But to open the doors, you don't think that that's the intent?

MR. DAVIS:  I don't know.  I wasn't there.  I imagine that when people approached the doors they were thinking about letting the others in, but I don't think that the idea was to push officers out of the way when the approach was done.  I don't think that was.  I mean, it wasn't like everyone turned around and charged the doors immediately.  People walk up towards the doors, and then you have Mr. Smith up in the front yelling at the officers that they might as well get out of the way, and then there's a push.

I mean, it just happens so fast; it just happens so fast. I don't think it's fair to say that he engaged in violence.  I just -- I think that he was in the wrong place at the wrong time and probably should not have even approached with the crowd. And I think a few split seconds afterwards shouldn't be

characterized as something he planned to do and something
extremely egregiously plotted out and done.  There was no --

THE COURT:  Clearly, there's no planning.  I'm just
having a hard time accepting your characterization of
culpability, that this was all a result of people around him.

MR. DAVIS:  I'm not saying that.  I'm not saying
that's all a result of it.  I think it's a factor you have to
take into consideration.

What would have happened if the crowd hadn't surged forward
and someone hadn't put their hands on their backs?  Do you think
they would have initiated that push?  You don't know, and the
evidence doesn't demonstrate otherwise.

THE COURT:  I don't think you have to initiate that
sort of assault to be held accountable for being a part of it.

MR. DAVIS:  He didn't get charged with assault,
though, Your Honor.

THE COURT:  I can consider the conduct in deciding
where to sentence, whether he's charged or not.

MR. DAVIS:  Initially, he was charged with
misdemeanors.  And I credit Mr. Dalke's comment, because he is
in a position to know how these cases were evaluated.  But if
this was such a -- if this was the highlight of the offense in
the Capitol, which seems to be the case now, one would think
that they would have known about it beforehand.  If there were
only two entry points to the Capitol, it seems like people would

1    have looked at that.

2              THE COURT:  It's hard to see the defendants.  It's

3    very hard to see them.  I had a hard time seeing them watching

4    the videos multiple times.

5              MR. DAVIS:  I guess the best I can say, Your Honor, is

6    that we don't know if it would have happened had the whole crowd

7    not surged forward and had someone not put his hands on both of

8    their backs and pushed them forward.

9         We don't know what Mr. Johnson was saying.  There is

10   nothing that conclusively establishes that he was yelling at the

11   officers.  There's nothing.

12        In terms of the fist pump, I disagree.  Mr. Johnson was

13   pointing where he was going.  I don't think that's a fist pump.

14   Actually, I don't even know if Mr. Dalke was saying it was

15   Mr. Johnson.  He was speaking in terms of senior and junior at

16   the same time.  But in any event, if Mr. Johnson, Daryl Johnson

17   raised his hand, I would submit that it was to point where they

18   were going.

19        And they did leave.  He did leave right after that.  If

20   anything -- I mean, it may not be a written expression of

21   remorse, but he did leave right afterwards, and I think that's

22   an indication that he recognized that something was amiss.

23             THE COURT:  He left and went upstairs.  He didn't

24   leave the Capitol.

25             MR. DAVIS:  Because he couldn't get out those doors.

He went upstairs and left the Capitol from that level.  I mean,
I -- there's not much else I can say to that, Your Honor.  It's
easy to -- again, I will switch back to the next morning
quarterback argument.  It's very easy to take this apart, but
you have to realize, these were split-second events, and the
most egregious event that the United States is arguing about
lasted mere seconds.  And you just don't know.

I mean, again, this wasn't planned.  And we all know that.
Mr. Johnson did not bring any weapons to the Capitol.  He didn't
bring any protective gear.  He didn't break anything.  He didn't
move anything.  He didn't take anything.  And he didn't assault
anyone.  He moved with the flow of the crowd.  Should he have
done that?  Probably not.  Should he have pulled himself out of
it?  Probably so.  He didn't do it.  And he's taking a felony
for that conduct.

You look at some of the other individuals, again, Jeffrey
Smith, removing the benches, goes away, comes back.  He assists
the crowd in forcing the doors open.  I'm reading from the
government's sentencing memorandum in his case.  He's screaming
with his face inches apart of the officers, "Stand down.  We're
getting in there one way or another."  And it was unclear
whether he actually physically assaulted the officers.  He
cheered and encouraged rioters on while he was videotaping as he
walked through the Capitol.  He sent a message out that "America
is not going to take a fraudulent election."  I mean, these

1    statements were comments of what he was doing, not what he was

2    observing.  And finally, I think the most important thing is, he

3    lied to law enforcement when he interviewed with them.  And

4    that's not the case with Mr. Johnson.  Now, he did get 90 days,

5    but he isn't going to carry the pain and life-altering

6    consequences of a felony conviction.

7        And that last fellow that ended up pleading to a

8    misdemeanor and got 35 days, his conduct was very similar to

9    Mr. Johnson's, but look at his criminal history.  It was

10   ridiculously long.  I mean, he had convictions for possession of

11   a controlled substance.  He had a long-standing addiction.  He

12   had convictions for assault with a deadly weapon, another

13   conviction for carrying an unregistered firearm.  He was allowed

14   to plead to a misdemeanor and pretty much the same conduct.

15       And you take Frank Scavo, he got 60 days.  He was allowed

16   to plead to a misdemeanor.  Now, he wasn't standing there with

17   the Johnsons, but he posted statements, a blow-by-blow reporting

18   to the public about how they were storming the Capitol and

19   taking it over and they weren't going to take this, they're

20   going to take the Capitol back.  And he went as far as setting

21   up on his social media a picture of him driving a bus where he's

22   labeled it "the sedition express."  And he was allowed to plead

23   to a misdemeanor, and he got 35 days.

24       Mostofsky has his own issues.  We all know the case.  He's

25   all over the media, and he was the poster boy.  In my

experience, if you're the poster boy of January 6, you pay a price, and he paid a price.  But even looking at what he did, he pled to a number of offenses in addition to the 231(a)(3).  He stole a bulletproof vest and a shield.  He chased Goodman up the steps.  He entered the same way the Johnsons did the building.  And I think perhaps most importantly, the sentencing guidelines were 12 to 18 months, and Judge Boasberg varied from the guidelines and imposed a sentence of four months less than the 12 months that he should have been sentenced to.  But he's very different.  It's apples and oranges.

Again, I think the social media comment that Mr. Johnson posted, I mean, honestly, some of them I honestly believe they're First Amendment protected speech.  He can comment on what he observed.

THE COURT:  All of that is First Amendment protected.

MR. DAVIS:  He's not encouraging anyone to do anything.  He's commenting.  It's bravado maybe, but he's not encouraging anyone to do anything.  He's not telling them we're going to start a revolution.  He's commenting on what his observations of that crowd were.

In terms of general deterrence for him, I think a man with his background, he's 51 years old.  He's been married for 30 years.  He has no substance abuse problems.  And but for this offense, his background is clean enough to run for political office.  I mean, it's just -- for him to be left with a felony

is more than -- more severe than anything the other individuals we talked about had levied against them.  I mean, for someone like him, this has life-altering consequences.  I mean, he's from a small town.

As Your Honor knows from the many letters that were sent on his behalf, for one thing, you don't get that many letters unless you really are a person of strong character and have conducted yourself as a model citizen all those years.  You just don't get letters like that.

The presentence report recommended 30 days.  I think that's unreasonable given these circumstances.  I think given the fact that he is now a convicted felon for the rest of his life, I think a low-end guideline sentence is more than reasonable and appropriate here.  I just feel anything else would be excessive and out of line with the other sentences that have been imposed in this case.

THE COURT:  Okay.  Mr. Dalke, any response to the characterization of the other cases?

MR. DALKE:  Not particularly, Your Honor.  The only case we haven't discussed that was mentioned was Mostofsky.  I will say, he did have a higher sentencing guidelines.  He was involved on the west front that we can tell.  I will say the one thing, though, is once he was inside, he posed for pictures.  He posed for videos.  In comparison to the Johnsons, once inside, didn't go to the public media.  They went to go to breach the

1    east side of the Capitol and let more rioters in, to continue

2    the assault, to continue the breach, to continue the

3    insurrection.

4         So I think there are a lot of overlaps in the Mostofsky

5    case.  I do think he had some enhancements, whereas the Johnsons

6    may have been one back.  And we don't have the best video, you

7    know.  Once they're in that scrum, it's hard to tell whether

8    they laid hands on officers or not.  Mostofsky, we have videos

9    showing he did have the physical confrontation with officers.

10   So his guidelines are higher, and that would make sense.

11        But we're not asking for eight months or twelve months

12   here.  We're asking for three to six months.

13        THE COURT:  One question I had is Mr. Davis just said

14   that the conduct of Mr. Smith, that defendant, was more severe,

15   I believe, and that he was at the front.  I understood you to

16   say he wasn't, he didn't remove the iron benches at the front of

17   the closed doors, but he was actually behind the defendants; is

18   that correct?

19        MR. DALKE:  That is correct, Your Honor.  So there's

20   been some -- as you would expect, there's a lot of facts.  So he

21   moved the benches.  And this was I don't know how many minutes,

22   but I would say approximately ten give or take five minutes

23   before this push at the doors.  So before the crowd had

24   congregated, before anyone was there, he moved those benches

25   that had been placed in front of those doors.  Law enforcement

1    saw it.  They stopped it.

2         He then later kind of continued to circle that area, and

3    there were points prior to the push where he's yelling and he's

4    in close proximity to those officers.  Again, he leaves and goes

5    into the rotunda and then comes back.

6         So at the time of the actual push, he's over by the stairs

7    almost out of that video, sees the push happening, comes over,

8    and joins it kind of behind the Johnsons.  But when he's in

9    close proximity to the officers, it's not during the push.  It's

10   minutes before that push occurred.

11        THE COURT:  What about Mr. Davis's argument that Daryl

12   Johnson moved forward because he was pushed from behind?

13        MR. DALKE:  I don't think the video evidence supports

14   that.  And I can play it again for Your Honor.  An individual

15   does come and place a hand on the back, I think, at one point of

16   each defendant, but you can clearly tell they are moving forward

17   with their own volition.  This isn't someone ramming into them.

18   And they put their hands on the backs of the people in front of

19   them.  They did the same thing.

20        And again, you don't get to the front, the apex of that

21   scrum, the threshold of those east rotunda doors and the breach

22   without the other people behind you.  I mean, it was a

23   collective group effort.

24        But I don't think you can say -- I don't think there can be

25   a reasonable interpretation of the video that they were

1    involuntarily shoved into that and involved in that push because

2    someone else put them there.  It was their conduct.  It was

3    their actions through and through.

4            THE COURT:  Okay.  I will give Mr. Orenberg a chance

5    to allocute, and then I will give both defendants a chance to

6    speak if they would like to do so.  I know they submitted

7    letters to the Court, which I've reviewed and I appreciate.

8            MR. ORENBERG:  Yes, Your Honor.  May I proceed?

9            THE COURT:  Yes.

10           MR. ORENBERG:  Thank you, Your Honor.

11       Your Honor, much of what I was going to say about the

12   conduct that has been discussed today or viewed on the video has

13   already been said by Mr. Davis.  Unless the Court has any

14   specific questions about the conduct of my client as seen in

15   that video, I would like to move on to other areas.  But I'm

16   incorporating by reference and echoing exactly what Mr. Davis

17   has said about Mr. Daryl Johnson with respect to being --

18   someone from behind placing a hand or hands on their backs,

19   pushing them forward, what happened immediately afterwards,

20   pointing to going upstairs.  They were not raising their hands

21   in any sort of further harm, in any sort of defiant gesture.

22   They were just getting ready to move away and to move away

23   quickly from what was going on there.

24       Mr. Dalke talks about the social media posts that my client

25   made later that day.  I make the same arguments that Mr. Davis

said and that the Court observed, that these are expressions
that are protected by the First Amendment.  He did these social
media posts in an expression of bravado, an expression of the
heat of the moment or the moments or the days following what
happened there on January 6.

As I said in my memo and what is clear and, I think, the
Court understands, there was no preplanning by Mr. Daniel
Johnson regarding what happened, what transpired that day within
the United States Capitol.

And I'm just looking at my notes from what Mr. Dalke said.
They may have been a part of the first group that was inside,
but as the Court clearly understands, they moved through the
Capitol in somewhat of a faster series of motions and found
themselves in that east rotunda door area.  What transpired
there just happened for a few seconds.  Then they moved on.
They moved upstairs.  And they moved outside.

As Mr. Davis pointed out on behalf of Daryl Johnson, taking
a felony charge in this case is a life-altering event and
perhaps even more so for younger Mr. Daniel Johnson.  He's 30
years old.  He has his entire life ahead of him.

As I pointed out in my sentencing memorandum, he is
currently working as an on-site supervisor and sales for a
roofing company some 60-plus hours a week, and he is hoping to
assume management control of the company and to buy the company
in the foreseeable future.  I say to the Court that, as

1    Mr. Johnson has told me, that any sentence of incarceration will

2    be detrimental if not irreparable to his purchasing and managing

3    the company.

4         As Mr. Davis pointed out, I'm going to belabor this point

5    again, the felony moniker, the consequences of a felony on

6    Mr. Daniel Johnson are going to be dramatic in the next 30 to

7    40, maybe 50 years of his productive work life when he goes to

8    apply for business lines of credit, if he's successful in

9    purchasing the company, when he goes to engage in contracts with

10   other vendors.  I mean, all of this is going to come up, and

11   he's going to have to explain it, and hopefully, it won't be an

12   impediment to his hopes and dreams of owning the company in the

13   near future.

14        Again, you know, we submitted some letters in support of

15   Mr. Johnson.  I think they demonstrate to the Court that he is

16   well thought of.  He is well respected within the community.

17        Your Honor, I mean, the fact that Daniel Johnson -- the

18   mere fact that Daniel Johnson accepted responsibility very early

19   on, as Mr. Dalke said, when he was arrested, he had a candid

20   conversation interview with law enforcement authorities.  He did

21   not try to run or minimize what had happened, what he had done

22   in the United States Capitol that day.  He has been cooperative

23   throughout the entire proceedings of this case.

24        He's had his little bumps.  We've already discussed the

25   criminal history.  We understand and accept the Court's decision

on the criminal history category of II.  As I'm sure the Court is well aware, that puts him within Zone B of the sentencing guidelines table.  And I know the Court is aware of this, but when someone is in Zone B, the Court has discretion to impose a sentence of probation with a condition requiring at least four months of intermittent confinement, community confinement, or home detention, which would satisfy the minimum term of imprisonment specified in the guideline range.

And so I am asking for a term of probation for Mr. Daniel Johnson with the special condition of home detention with work release privileges so that he can continue to work, he can move towards his hopes and dreams of purchasing this company in the foreseeable future.  He is willing to do community service hours.  I think this is an excellent opportunity for the Court to impose a large number of community service hours so he can give something back to the community.

Unless the Court has any other questions, that is what I am asking the Court to do for Mr. Daniel Johnson.

THE COURT:  Okay.  Mr. Orenberg, what about Daniel Johnson turning around and using his back to get more leverage to push against the crowd with the officers in front of the door?

MR. ORENBERG:  Again, Your Honor, as Mr. Davis observed and told the Court, these are actions that happened in seconds.  They were reactionary to the crowd, what was going on

1    there in that, as the Court has called it, the scrum of the

2    crowd.  Someone was pushing them from behind.  Unfortunately,

3    Mr. Johnson then turned around and perhaps -- it looks like he

4    was using his back, but again, my observation, it's not totally

5    clear exactly what was going on in there.  It was a very

6    confusing moment in time.

7            THE COURT:  All right.  Let me start with Mr. Daryl

8    Johnson.  You have the right to make a statement.  Again, I've

9    reviewed your letter, which I appreciate greatly.  But if you

10   would like to make any additional comments, you have the right

11   to do so.

12           DEFENDANT DARYL JOHNSON:  Thank you.  Thank you, Your

13   Honor.

14       January 6 was, obviously, not one of my shining moments in

15   my life for many, many reasons.  But the emotional toll on

16   myself and my family prior to January 6 really can't be

17   overstated.  With the COVID shutdowns that the whole world was

18   dealing with, unchecked rioting and looting in many of our

19   cities, burning of our American cities, the whole world seemed

20   to be upside down.  Wrong was called right, or it was excused.

21   It just felt to me as if the whole world went a little crazy.

22       I've worked my whole life to secure my family's future and

23   to have a legacy to leave to my family, and it almost completely

24   vanished in just a few short months during the summer of 2020.

25   And it felt so unfair and so wrong, and I felt hopeless or I

1    felt that it was beyond my ability to control.

2        As I look back on, you know, the events, the life events

3    that happened prior to me going on January 6, it's obvious that

4    I was in a pretty emotional state.  I just didn't -- with

5    everything that happened, I just really didn't have a good

6    understanding of emotionally where I was at, what was going on,

7    the worry and the fretting of potentially losing our business.

8    Our business spent most of 2020 on the edge of having to be

9    closed.  And I was simply just not in a good place when I took

10    off to go to Washington, D.C., on January 6.

11        And all I can say is that even being there was a huge

12    mistake.  Being able to look back on it, I wouldn't do it.  I

13    wouldn't even attend the rally, to do it again.  If similar

14    circumstances were to come about, I wouldn't even go.  But at

15    the time, I just didn't understand where -- I don't want to use

16    the word "fragile," but just the emotional position that I was

17    in and the challenges and stress that I was dealing with.

18        So the best way that I can describe where I'm at as I've

19    watched the video and I've reflected on that day is heart-

20    breaking.  I'm -- I've spent over two decades of my life helping

21    people with their marriages, and many, many times, the marriages

22    that came in to get help from me, a lot of it was pain and

23    anguish from other circumstances, not necessarily so much

24    circumstances in their life but just pain and anguish of life.

25    Right?  Sexual abuses, different things like that.

1       And for me to -- as I look back on it and I realize that

2  our legislators and the officers and the aides and everybody

3  that works and does business in and around the Capitol, for me

4  to be a part of something that caused that pain and anguish that

5  they're going to have to deal with really causes me heartbreak.

6  And I'm truly, truly sorry.  If it was possible to go to each

7  one of those persons that were affected and ask for forgiveness

8  and tell them how sorry I am, I would do it in a heartbeat.

9  Obviously, it's just not possible.

10      So living with a felony, obviously, changes the direction

11  of our business.  It's going to change the direction of our

12  family.  As I learn to live with the knowledge that the felony

13  conviction is going to take away some of the hopes and dreams

14  that we had for our family, international travel, places in the

15  world now that I'll never be able to go and things that we will

16  never be able to do as a result of living with a felony, that

17  changes our entire family.

18      And that's no small fact.  That's no small consequence.

19  It's something that my wife and I and my kids, we worked super

20  hard and put in untold amount of hours to build a legacy and

21  build a future and build a business for our family so we can

22  live a good life and retire well.  And a lot of those things

23  that we desired to do are now gone.

24      So I guess all I can say is I understand that my behavior

25  was wrong.  I understand the consequences of having to live with

1    a felony and deal with this is my fault.  There is no excuse.

2    There is no -- I can't blame this on anybody else.  I've got to

3    own it.  This is me.  It's something that I did, and again, like

4    I say, I'm heartbroken.

5        But I'm a hard-working man.  We've literally busted our

6    rear our entire life to get to where we are at, and I spent 51

7    years of my life and never ever been in a situation like this.

8    I made a horrible, horrible mistake, just not understanding what

9    was going on in the moment at the Capitol, not understanding

10   emotionally where I was at, just the whole circumstance

11   surrounding, you know, COVID-19 and the shutdowns.  I didn't

12   understand it, and that's my mistake, and there's consequences.

13       But I can tell you this, Your Honor:  You won't see me back

14   in your court again.  I've learned my lesson.  I won't allow

15   myself to be put in this situation ever again.

16            THE COURT:  Thank you, Mr. Johnson.

17       Mr. Daniel Johnson, would you like to make a statement?

18            DEFENDANT DANIEL JOHNSON:  Yes, Your Honor.  Thank

19   you.

20       I would like to start by apologizing to everybody who

21   worked at the Capitol and was present at the Capitol that day

22   for what I put them through, their families through.

23       My actions that day are not excusable in any way, shape, or

24   form.  I don't think they -- I mean, it was really out of

25   character for me.  None of this was my intention or even a

thought in my mind when we decided to go to D.C. and when we arrived and even when we were at the rally all the way up to the Capitol.  It never was a thought of to do -- to have any of this happen or have any of this behavior.  My behavior is inexcusable.

I've worked hard my entire life.  I work 60 hours a week, sun up to sun down.  I always strive for excellence in everything I do.  And in one day, I've compromised everything that I've worked for.  I ask forgiveness for my actions.  I realize my behavior was unacceptable.  I will have life-long consequences as a result.  And rest assured, this entire experience has been life-changing for me.

THE COURT:  Thank you, sir.

MR. DAVIS:  Your Honor, Mrs. Johnson wanted to address the Court briefly, and I believe she's going to address both her husband and her son.

THE COURT:  Good morning, ma'am.

MRS. JOHNSON:  Your Honor, these are good men.  They're hard-working men.  They both grew up knowing how to put in a day's work.  They care about their community.  They're involved with their community.  And they're devoted to their family and friends.

This past year has been absolutely devastating to our entire family.  The threats that my daughter and I have received on social media because of this, the threats that were made to

1  both Daryl and Daniel has put an unimaginable amount of stress

2  on the entire family.  What's decided today doesn't affect just

3  Daryl and Daniel, but it affects myself and the rest of the

4  family and has the potential to cause severe setback to my

5  health as I have a heart condition.  The added stress has not

6  been good for that.

7       You're seeing a blip in a lifetime for both of them.  They

8  made a terrible error in judgment in the heat of the moment.

9  But I just want you to know this is not who they are, and they

10  have to live with the consequences of their actions for the rest

11  of their lives.

12      I'm begging the Court to show mercy.  You both literally

13  and metaphorically hold my heart in your hands as you make your

14  decision.

15      Thank you.

16           THE COURT:  Thank you, Ms. Johnson.

17      All right.  Is there any reason why sentence should not be

18  imposed at this time?

19           MR. DAVIS:  None on behalf of Mr. Johnson.

20           MR. ORENBERG:  None on behalf of Daniel Johnson.

21           MR. DALKE:  None on behalf of the government, Your

22  Honor.

23           THE COURT:  All right.  So before I impose a formal

24  sentence, I want to give my reasons for the record for both

25  defendants.

1    In addition to considering the guidelines that are

2    advisory, I'm also required to consider the various factors

3    outlined in Title 18 United States Code Section 3553(a) in

4    deciding what sentence to impose.  I'm familiar with all of

5    those factors, and I've considered them all here, even if I

6    don't mention each one.

7    Let me just say at the outset, this is an extremely

8    difficult case.  On the one hand, looking at the nature and the

9    circumstances of the offense, like all of the Capitol riot

10   cases, this is a very, very serious offense.

11   Here, the defendants stand convicted of felony civil

12   disorder offense.  Although the Court appreciates that there's

13   no evidence that the Johnsons came to D.C. on January 6

14   intending to break the law or to engage in any civil

15   disobedience, at some point that day, their intentions went well

16   beyond exercising their First Amendment rights at a political

17   rally.

18   After attending the stop the steal rally, the defendants

19   joined a large crowd that walked towards the Capitol.  And

20   although they were not a part of the initial violent mob that

21   breached the west side of the Capitol building, they did breach

22   leaf barriers that surrounded the exterior of the building, and

23   they climbed through a broken window to enter the Capitol

24   building shortly after that initial pack of rioters overcame

25   police officers.  And they did so within minutes of the others,

I think eight minutes after the initial violent breach occurred.
So they clearly witnessed that breach.

At the time members of Congress had gathered to certify the
vote count of the Electoral College for the 2020 presidential
election.  When the defendants entered the Capitol at
approximately 2:20 p.m., they went first to the crypt and then
to the rotunda.  At approximately 2:37 p.m., they walked out of
the rotunda towards the east rotunda doors, where they
encountered a large mob that was pressuring three police
officers who were standing in front of the east rotunda doors
not letting a large mob from the outside enter the Capitol.

As the officers tried to prevent the east rotunda doors
from being breached, the mob, including the defendants
themselves, appear to have yelled and chanted at the officers.
We've watched this chilling footage here today.  The two other
videos we didn't watch that the Court has watched multiple times
have audio in them.  As the government pointed out, in these
videos, you can hear the blaring alarms.  You can hear the loud
yelling and the chants by the rioters.  We can't hear exactly
what the defendants said, but it appears that they too were
yelling.  And regardless whether they were yelling, they
certainly could hear the chants that are audible on the video.

The officers were under intense pressure to step aside, and
they were far outnumbered.  As they stood pinned against the
east rotunda doors, the crowd, including the defendants, charged

towards them.  It was a very, very dangerous situation.  And

although neither defendant -- the Court can't tell, but I will

assume that there's no evidence that the defendants actually

touched the officers.  The video clearly shows them at the front

of the mob charging towards the officers along with the rest.

The mob rushed the police line and pushed through the officers

to open the east rotunda doors, allowing an even larger mob of

rioters to flood the Capitol building.

The Court recognizes that this conduct lasted only seconds,

and again, there's no evidence that either of the Johnsons

planned when they entered the Capitol to engage in this conduct.

But I do believe that they both did more than just move with the

crowd.  I think that they intentionally stepped forward, and

again, whether they made statements or not, they were surrounded

by others who were yelling at the officers.  There's no question

what the intent of the mob was, and there's no question that the

defendants knew officers were present defending those doors and

that they knowingly put these officers at great risk of harm.

We watched on the video, one of the videos, it wasn't the video

we watched today here, but the government is correct that an

officer or two noticeably walks away, limping away from that

experience that they faced as they were in great danger.

The defendants didn't stop there.  Instead, they climbed

another flight of stairs to the third floor, and while walking

through the hallway, Daniel Johnson appeared to attempt to open

a door to a private room.  The room appeared to be locked.  The defendants continued walking down the hallway, and eventually, they exited the building around 2:46 p.m., approximately 26 minutes after they initially entered the building.

I find the defendants' criminal conduct on that date, particularly their efforts to shove aside officers to assist the larger mob of rioters attempting to enter the Capitol building, I find it not only demonstrated extreme disrespect for the law and the democratic process, it also put those law enforcement officers at enormous risk, and it heightened the risk to members of Congress, the vice president, and their staffers whom the officers were defending.

As we all know, the Capitol riot resulted in physical harm and millions of dollars of property damage to the Capitol, although the Court recognizes that there's no evidence that either defendant caused physical injury or property damage, but again, their actions there at the east rotunda doors could have led to serious injury.  And for that reason, the nature and seriousness of this offense weighs in favor of imposing a term of imprisonment.

The defendants' post-offense statements also undermine any suggestion that their actions on January 6 showed a momentary lack of judgment.  As the government's noted, Daryl Johnson posted disturbing comments days later and even more than a month after the Capitol riot.  Daniel Johnson made clear that he had

been trying to find a way into the house speaker's chamber that day.

I do agree with the defendants that the aggravated role adjustment is not appropriate in this case, nor is a minor role adjustment.  Again, neither defendant helped plan the events of January 6.  Again, the evidence suggests that neither had any intention of engaging in violence when they traveled to D.C. or even when they entered the Capitol.

Even so, contrary to statements in their sentencing memoranda and statements today, I don't see their conduct as equivalent to that of the average January 6 participant that day.  I do find that their conduct was aggravated at the east rotunda doors.  Again, there's no doubt they put the officers' safety at extreme risk in a way that most January 6 defendants, not all, but most did not.

On the other hand, turning to the Johnsons' history and characteristics, there are a number of positive factors here that the Court's considered.  As defense counsel has pointed out, the letters that I have received on behalf of both of them are highly supportive.  They show that both of them have been very solid employees who have done good works in the community, and they have a lot of support, both family support and community support.

And although their remorse was slow in coming, I credit both defendants for their early acceptance of responsibility and

their truthful interviews with the FBI.  I also believe that the statements they've made today and in their letters to the Court are genuine and heartfelt.

I do view particularly for Daryl Johnson, I view this conduct as truly aberrant behavior.  I do appreciate what he said about the emotional toll of 2020 and the pandemic, and I thought Daryl Johnson showed a lot of self-awareness when he talked about not being in a good place and how wrong seemed right in those months in and around January 6, and he was in a highly charged emotional state at the time.

He is 51 years old, is married with two adult children. He's not had any criminal history whatsoever in his life.  He received an associate degree in 1991.  He owns and operates a number of successful businesses, including laundromats, a tanning salon, and a manual car wash.  The PSR reflects that he has substantial assets from these businesses.  In addition to no known criminal history, he has no known substance abuse or any mental health concerns.

And as the letters to the Court attest, he's led truly an exemplary life.  To this point, he's been active in his community and has done a great deal over the last decade to help the neediest customers in the laundry industry he serves.  He's also volunteered as a marriage counselor and has done various other good works in his neighborhood and his community.

Turning next to Daniel Johnson, he's 32 years old.  He

resides with his parents.  He graduated from high school with a
dual enrollment diploma and is employed as a roofer.  He has
ambitions to buy the roofing business and run that in the near
future.  He's never been married, does not have any children.

He has three prior convictions, all misdemeanor
convictions.  They include a disorderly conduct and a possession
of marijuana case.  The PSR reflects ongoing marijuana use
during the pendency of his supervision in this case.

Again, the letters that the Court's received on behalf of
Daniel Johnson as well makes clear he's a hard worker.  He
applies himself, gives 100 percent in his job.  And I would note
also that the statements of Ms. Johnson support all the letters
that I've received as well.  So I don't want to in any way
minimize the good work both defendants have done in their jobs
and their employment and in the community.

Looking at the range of sentences available here, both
defendants face up to five years' imprisonment, a fine of up to
$250,000, and a term of supervised release of not more than
three years.

Consistent with the plea agreement, I will impose
restitution.  Both defendants agree to pay $2,000 to defray
costs associated with the January 6 damage to the Capitol.

Moving on to the need to avoid unwarranted sentencing
disparities, we've talked a lot about these cases that the
government's highlighted in its sentencing memorandum as

analogous here.  As I stated at the outset, I don't understand why a number of the other defendants also are not charged with a felony offense.

With that said, I do think the felony charge is appropriate here, given the criminal conduct, and I would simply encourage the government going forward to ensure that it is treating similarly situated defendants similarly.  The government's credibility is undermined with the court, the judges when similarly situated defendants appear to not be charged with similar offenses based on the underlying conduct.  But again, to be clear, I do think the felony charge is appropriate in light of the evidence before the Court.

Looking at -- so far as the Court is aware, only one other Capitol riot defendant has been sentenced to a civil disorder felony violation under Section 231(a)(2) -- 231(a), and that's Aaron Mostofsky, who was sentenced by Judge Boasberg to eight months' incarceration.  Like the Johnsons, he was a part of a crowd that pushed against officers who were attempting to keep rioters from entering the Capitol building.

But Mostofsky is distinguishable from this case in a number of respects, including the fact that he pled guilty to two other offenses.  He pled guilty to a theft offense for stealing police protective riot gear, as well as a misdemeanor trespass offense. He also had no criminal record, but his guideline range was 12 to 18 months in prison, significantly higher than either

1    defendant in this case.

2        The other Capitol rioters who pled guilty in connection

3    with the breach of the east rotunda doors all entered pleas to a

4    misdemeanor.  And yet, the conduct in this case is similar in

5    many respects to those other cases involving Jeffrey Smith,

6    Frank Scavo, and Mark Simon, all of whom were sentenced --

7    although they were allowed to plead guilty to misdemeanors, they

8    were sentenced to terms of imprisonment ranging from 35 days' to

9    90 days' imprisonment.  I'm not going to go through each case.

10   We've discussed some of the similarities and the differences.

11   But I do find that they are analogous cases in many respects.

12       Before I announce the sentence I will impose in this case,

13   I do want to make clear that I'm not punishing the defendants

14   for any statements they've made, nor am I punishing them for

15   coming to D.C. to exercise their First Amendment rights to

16   protest and participate in political activity.  They had every

17   right to do those things.

18       What makes this case so difficult for the Court is the

19   nature of the offense here, and that makes it more -- as I said,

20   more egregious than most of the January 6 cases that I've

21   sentenced to date, the fact that these defendants subjected law

22   enforcement officers to a substantial threat of harm as the

23   officers stood guard at the east rotunda Capitol doors, pinned

24   against the doors, facing a large, violent crowd both inside and

25   outside the Capitol.  And even though, I'm assuming for purposes

1    of the sentence, that neither defendant touched the officers, I

2    do believe they heightened the risk to those officers by joining

3    the crowd and pressing forward with the crowd.  And I don't

4    credit the argument that they were pushed forward solely by

5    people behind them.  I saw them stepping forward.  I think they

6    were leaning forward.  I think they were fully engaged, though I

7    do appreciate that this was, perhaps, impulsive behavior, split-

8    second decision that only lasted -- I think the whole scrum was

9    around 20 seconds.

10          And yet, that is the case with a lot of crimes that this

11   Court has to face in the courtroom.  Many, many defendants are

12   held responsible for impulsive decisions they made in seconds.

13          But these actions are what distinguish this case from many

14   of the other January 6 trespassing cases for which I've imposed

15   probationary sentences with or without periods of home

16   detention.

17          But for -- I will start with Daryl Johnson.  But for his

18   incredibly exemplary record to date in the community and in his

19   work and in his family, I would sentence him to a longer period

20   of prison absent his exemplary role.  But consistent with the

21   recommendation of the Probation Office, I will impose a sentence

22   of 30 days in prison.

23          I will also order him to pay a $2,000 fine in addition to

24   $2,000 in restitution to help further defray the costs of his

25   imprisonment and the costs associated with the Capitol riot.

1    I will also follow the recommendation of Probation and

2    sentence Daniel Johnson to a term of imprisonment based on his

3    criminal history and his resulting guideline range and his

4    actions that day, which I do view as more egregious.  He was the

5    first to enter the Capitol.  He did step forward first.  He did

6    try to open a door in the Capitol.

7        And for those reasons, again coupled with his criminal

8    history, I will sentence him to four months in prison.  But

9    because of his limited financial assets, I will not order him to

10   pay a fine, but only the $2,000 of restitution.

11       I believe these sentences are sufficient but not greater

12   than necessary to achieve the goals of sentencing.  Considering

13   the nature of the offense and the other relevant factors, I

14   believe these sentences are adequate to protect the community

15   and to fulfill the goals of deterrence, both specific and

16   general, as well as to punish the defendants for their criminal

17   acts.

18       So I will now read the formal sentence of the Court, and I

19   will give both sides a chance to object before I impose

20   sentence.

21       So with respect to Daryl Johnson, pursuant to the

22   Sentencing Reform Act and in consideration of the provisions of

23   Title 18 United States Code Section 3553, as well as the

24   advisory guideline range, it is the judgment of the Court that

25   you are hereby committed to the custody of the Bureau of Prisons

1    for a term of 30 days as to Count 1.  You're further sentenced

2    to serve a supervised release term of one year as to Count 1.

3    In addition, you're ordered to pay a special assessment of $100.

4         While on supervision, you shall abide by the mandatory

5    conditions as well as the standard conditions of supervision.

6    The mandatory conditions include not committing another federal,

7    state, or local crime, not unlawfully possessing a controlled

8    substance, refraining from any unlawful use of a controlled

9    substance.

10        You must cooperate with the collection of DNA as directed

11   by the Probation Office.

12        You must make restitution, and those payments can be made

13   to the Architect of the Capitol in the amount of $2,000, and the

14   payment shall be made to the Clerk of the Court for the U.S.

15   District Court.  You're also ordered to pay a fine in the amount

16   of $2,000.  The defendant may pay interest on restitution and a

17   fine of more than $2,500 unless the restitution or fine is paid

18   in full before the 15th date after the date of judgment.  So the

19   lump sum payment of $2,000 is due immediately, payments in equal

20   monthly installments of $200 over a period of ten months to

21   commence 30 days after release from imprisonment to a term of

22   supervision.

23        You also must provide the Probation Office access to any

24   requested financial information.  You must not incur new credit

25   charges or open additional lines of credit without approval.

1        Within 60 days from release of incarceration or placement

2   on supervision, I will order a re-entry progress hearing.  At

3   that time I will consider -- I will consider a progress report

4   that Probation shall prepare, and if there's a need for a

5   hearing, I will order a hearing.  I will also at that time

6   consider whether it's appropriate to transfer supervision to the

7   home district.

8        To the extent you have not validly waived your right to

9   appeal as a part of the plea agreement, you do have the right to

10   appeal the conviction and the sentence imposed by this Court.

11   You must do so within 14 days after the Court enters judgment.

12   And if you are unable to pay the cost of appeal, an appeal can

13   be filed without any cost to you.

14        Before I order that sentence be imposed, Mr. Davis,

15   Mr. Dalke, and Ms. Field, are there any objections to the

16   sentence announced with respect to Mr. Daryl Johnson?

17   Mr. Davis?

18              MR. DAVIS:  No legal objections, Your Honor.

19              THE COURT:  All right.  Mr. Dalke?

20              MR. DALKE:  No, Your Honor.

21              THE COURT:  All right.  Ms. Field?

22              PROBATION OFFICER:  No, Your Honor.  Thank you.

23              THE COURT:  Okay.  All right.  So I will order that

24   that sentence be imposed.

25        In addition, is there a motion to dismiss the remaining

charges?

MR. DALKE:  Yes, Your Honor.  The government moves to dismiss Counts 2 through 5 of the superseding indictment, which was filed December 20, 2021.

THE COURT:  All right.  That motion is granted.

And is there any objection to allowing Mr. Johnson to voluntarily surrender when directed by Probation?

MR. DALKE:  No objection from the government, Your Honor.

THE COURT:  All right.  So in light of his performance on pretrial supervision, I will permit Mr. Daryl Johnson to voluntarily surrender.

All right.  With respect to Mr. Daniel Johnson, again pursuant to the Sentencing Reform Act and in consideration of the provisions of Title 18 United States Code Section 3553, as well as the advisory sentencing guidelines, it is the judgment of the Court that you are committed to the custody of the Bureau of Prisons for a term of four months as to Count 1.  You're further sentenced to serve a supervised release term of 12 months as to Count 1.  In addition, you're ordered to pay a special assessment of $100.

While on supervision, you shall abide by the mandatory conditions, as well as the standard conditions of supervision.  Those include not committing another federal, state, or local crime, not unlawfully possessing a controlled substance,

1  refraining from any unlawful use of a controlled substance,

2  submitting to one drug test within 15 days of placement on

3  supervision and at least two periodic drug tests thereafter,

4  cooperating in the collection of DNA, and making restitution to

5  the Architect of the Capitol in the amount of $2,000.

6  Restitution payments shall be made to the Clerk of Court.  I

7  find you don't have the ability to pay a fine.  Therefore, I

8  waive imposition of a fine.  I also waive imposition of interest

9  on the restitution payments.  You must pay the restitution

10 balance at a rate of no less than $200 each month.

11     You must provide the Probation Office access to any

12 requested financial information, authorize the release of any

13 financial information.

14     On supervision, you must submit to substance abuse testing

15 to determine if you've used a prohibited substance.  You must

16 also participate in inpatient or outpatient substance abuse

17 treatment and follow the rules and regulations of that program.

18     Again, within 60 days of release from incarceration, I will

19 ask that the Probation Office submit a report summarizing the

20 defendant's status and compliance with release conditions, and I

21 will determine at that point whether it's necessary to hold a

22 re-entry progress hearing.  I will also consider at that time

23 whether to transfer supervision to the home district.

24     The financial obligations are immediately payable to the

25 Clerk of Court, and again, Probation shall release the

1    presence investigation report to all appropriate agencies who

2    shall return the report to the Probation Office upon completion

3    or termination from treatment.

4        And consistent -- to the extent you have not validly waived

5    your right to appeal the conviction or sentence imposed, you do

6    have that right to appeal.  In order to exercise that right, you

7    must file any appeal within 14 days of the date that the Court

8    enters judgment, and if you are unable to afford the appeal, the

9    appeal will be filed without cost to you.

10       Again, I will ask the parties, is there any objection to

11   the sentence imposed -- the sentence announced?  Mr. Orenberg?

12       MR. ORENBERG:  Your Honor, Mr. Johnson is asking if

13   the Court would reconsider the sentence imposed so that he may

14   have work release conditions.

15       THE COURT:  You mean instead of imprisonment?

16       MR. ORENBERG:  Correct.

17       THE COURT:  No.  I did consider whether to impose a

18   split sentence, and I've decided against it.

19       MR. ORENBERG:  Your Honor, we're asking for a judicial

20   recommendation for FPC Yankton, which is in South Dakota near my

21   client's home, and it may be the same request by Mr. Davis.

22       THE COURT:  Okay.  I will make that recommendation to

23   the Bureau of Prisons.

24       Any objection to allowing Daniel Johnson to voluntarily

25   surrender?

1          MR. DALKE:  Not from the government, Your Honor, and

2   no objection to the sentence.

3          THE COURT:  Okay.  Any objections from Probation?

4          PROBATION OFFICER:  No, Your Honor.  Thank you.

5          THE COURT:  All right.  So that is the sentence I

6   will -- the sentence I just announced will be the sentence

7   imposed.

8       Is there a motion to dismiss the remaining charges with

9   respect to Daniel Johnson?

10         MR. DALKE:  Yes, Your Honor.  Again, the government

11  moves to dismiss Counts 2 through 5 of the superseding

12  indictment as to Daniel Johnson as well.

13         THE COURT:  All right.  That motion is granted.

14      Are there any other remaining issues we need to address?

15  Ms. Field, do you need time with counsel or the defendants now?

16         PROBATION OFFICER:  Your Honor, my intent was to call

17  both of them after the hearing just to go over the instructions

18  for self-surrender.

19         THE COURT:  Okay.  All right.  Mr. Davis,

20  Mr. Orenberg, anything else we need to address?

21         MR. DAVIS:  Your Honor, in addition to the

22  recommendation for the FPC, federal prison camp, in Yankton, I

23  would also ask, in the event that Yankton is full, that Your

24  Honor as an alternative recommend federal prison camp in Duluth,

25  Minnesota.

1          THE COURT:  All right.

2          MR. DAVIS:  FPC Duluth.  And I also noticed

3   Mr. Johnson is paying a $2,000 fine, $2,000 in restitution.  He

4   retained counsel.  As Your Honor knows, I came in to the case

5   after Mr. Abbenante's illness kicked in.  He suffered severe

6   financial consequences.  I would ask that he not be held

7   accountable to pay the costs of imprisonment.

8          THE COURT:  To the extent that was ambiguous, I didn't

9   intend to impose a fine and the cost of imprisonment.  I'm

10  imposing a fine to defer some of the costs of imprisonment and

11  the damage to the Capitol.

12         MR. DAVIS:  And then the final request would be that

13  the two be incarcerated at the same facility and enter at the

14  same time, if possible.  I've requested that before, and the

15  Bureau of Prisons has actually honored it in the past.

16         THE COURT:  I certainly have no objection to that.

17     Is that something Probation can help facilitate?

18         PROBATION OFFICER:  Your Honor, I don't personally

19  have experience with that.  I know that the Court can make the

20  recommendation, and the BOP will review that.  If that's

21  something the Court would like me to look into, I can.

22         THE COURT:  That's all right.  I'll make the

23  recommendation.

24         MR. DAVIS:  Thank you, Your Honor.

25         THE COURT:  Okay.  Anything else?

1          MR. ORENBERG:  No, thank you, Your Honor.

2          MR. DAVIS:  Nothing on behalf of Daryl Johnson, Your

3    Honor.

4          MR. DALKE:  Your Honor, my apologies.  I think this

5    was covered, but if not, the government does formally mark and

6    move the video Exhibits 1, 2, and 3, which were discussed and

7    presented to the Court, just to move them into the record, and

8    the government will add those to the public database following

9    this hearing.

10          THE COURT:  All right.  Okay.

11      Thank you, Mr. Daryl and Daniel Johnson, I wish you luck.

12    I don't know that I will see you.  I don't suspect that you will

13    violate conditions of supervision.

14      And I know this is a tough consequence, and I just --

15    understand that the nature of the offense was such that the

16    Court could not justify, given the risk that you put those law

17    enforcement officers to, not imposing a sentence of

18    imprisonment.

19      So I don't expect to see you all again.  I wish you all the

20    best.  Thank you.

21          (Proceedings adjourned at 12:04 p.m.)

22

23

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Sara A. Wick, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7          Please Note:  This hearing occurred during the

8    COVID-19 pandemic and is, therefore, subject to the

9    technological limitations of court reporting remotely.

10

11

12   /s/ Sara A. Wick                June 22, 2022

13   SIGNATURE OF COURT REPORTER     DATE

14

15

16

17

18

19

20

21

22

23

24

25